**In the Matter of: Delbert SNYDER, Deanna J. Snyder, and Robert Snyder, Debtors–Appellants.**

No. 97–3062.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1998.

Decided July 30, 1998.

Robert Lindstrom (argued), Mustain, Lindstrom & Henson, Galesburg, IL, for Appellee and Trustee–Appellee.

Gregg N. Grimsley, Carter & Grimsley, Peoria, IL, for Debtors–Appellants.

Before CUDAHY, EASTERBROOK, and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.

The bankruptcy court denied a discharge to debtors Delbert and Robert Snyder, and Delbert's spouse, Deanna, finding that they had transferred property to third parties with the intent to hinder, delay, or defraud their creditors. See 11 U.S.C. § 727(a)(2). The district court affirmed, as do we.

## I.

In the 1980s, Delbert and Robert Snyder, through a partnership known as "Snyder Brothers," farmed approximately 2,500 acres of land that they either owned or leased. They borrowed $1.2 million from the predecessor-in-interest to appellee Agribank, FCB to purchase 547 acres of that land, and they obtained additional loans from the Farmers Home Administration to acquire machinery. In 1987, however, the Snyders found themselves without the operating capital that they required and were unable to plant any crops that year.

In 1988, Delbert and Deanna Snyder filed a petition for relief under Chapter 11 of the Bankruptcy Code; Robert did the same. Four years later, we sustained the bankruptcy court's refusal to approve their amended plans of reorganization. *In re Snyder*, 967 F.2d 1126 (7th Cir.1992). Six months after that, the Snyders converted the Chapter 11 proceedings into Chapter 7 liquidations. William Christison was appointed to act as trustee in both of the cases.

On December 1, 1993, Christison and Agribank initiated eight adversary actions in the bankruptcy court against the Snyders and two corporations, Rodel Farms, Inc. (Rodel) and DAR Farms, Inc. (DAR). Christison and Agribank alleged that while the Chapter 11 proceedings were pending, the Snyders had shielded from their creditors income derived from property of the estate by way of certain arrangements with Rodel and DAR. So far as is relevant to this appeal, Christison and Agribank asked the Bankruptcy Court to deny the debtors a discharge pursuant to 11 U.S.C. § 727(a)(2).

Delbert Snyder had caused Rodel and DAR to be incorporated in 1987, when Snyder Brothers was forced to stop farming for want of operating capital. At all relevant times, the sole shareholder, director, and officer of Rodel was H. Alden Snyder, the father of Delbert and Robert. The sole shareholder, director, and officer of DAR at all relevant times was Errol Brewer, brother-in-law to Delbert and Robert. Following their incorporation, Rodel cash-rented from Delbert and Robert the acreage that they owned and Rodel together with DAR also began to lease the land that Snyder Brothers had theretofore leased. From the fall of 1988 through the spring of 1990, the two brothers farmed these lands pursuant to a custom farming agreement they had entered into with DAR. Robert also worked for DAR as a field hand and truck driver (DAR started a trucking business in 1989 or 1990), while Delbert occasionally sprayed crops on behalf of DAR and Rodel. Deanna Snyder was employed by both corporations as a bookkeeper and secretary.

After conducting a trial, the bankruptcy court determined that the Snyders had transferred property to Rodel and DAR. *In re Snyder*, No. 8881234, Opinion (Bankr.C.D. Ill. June 13, 1996) (Altenberger, C.J.). The court found preliminarily that the Snyders had conducted farming operations for the two corporations using their own equipment. That equipment, as well as the land that the

brothers owned and leased to Rodel and DAR, constituted property of the estate. The estate, however, was not adequately compensated for the use of the equipment. *Id.* at 10–11, 18. Rodel and DAR did pay rent on the land that they leased from Delbert and Robert; however, they paid at a rate of $90 per acre in both 1988 and 1989, ten percent below the minimum fair market value of $100 per acre for those years. As a result, the bankruptcy estate received some $15,185 less than it would have had the corporations paid the lowest fair market rate for the Snyders' land. *Id.* at 18–21.

Finally, the bankruptcy court found based on several circumstances that the Snyders had accomplished these transfers of property with the intent to hinder, delay, or defraud a creditor or creditors of the estate. First, two relatives of the debtors—Alden Snyder and Errol Brewer—owned the companies to which the property had been transferred. *Id.* at 22. Second, Alden Snyder, nominally the sole shareholder, officer, and director of Rodel, was unable to recall at his deposition anything about this corporation other than the fact that he owned it. *Id.* Third, two impartial witnesses testified that they observed no change in the operation of the farms after DAR and Rodel took them over; "[t]he [d]ebtors were essentially running the farms." *Id.* Fourth, DAR immediately hired Deanna and Robert as employees, and it contracted with Robert and Delbert to perform custom farming work on the lands that DAR and Rodel had taken over from Snyder Brothers. At the same time, the debtors reported no income other than what they received from the two corporations. *Id.* at 22–23. Finally, Rodel had paid the rent it owed on the acreage owned by Delbert and Robert in an "unusual" manner. The rent for 1988 was pre-paid before the debtors filed their bankruptcy petitions in June 1988. The 1989 rent was not paid until April 1990, however, and the rent due for 1990 was not paid until April 1991 and then only in part. Outstanding balances of $23,584.82 for 1990 and $10,000 for 1991 were not discovered until Rodel began to prepare for trial four to five years later. *Id.* at 23. "This is strong evidence that the parties were not functioning at arm's length." *Id.* For these reasons

the bankruptcy court concluded that the debtors should be denied a discharge. *Id.*

On appeal, the district court agreed that the debtors had transferred an interest in property. *In re Snyder,* No. 96 C 1517, Order at 11 (C.D.Ill. July 11, 1997) (McDade, J.). The Snyders had, in the first instance, transferred an interest in their farm land by renting it to Rodel and DAR at less than fair market value. *Id.* at 11–12. They had permitted their farming equipment to be used for the benefit of the two corporations without compensation. *Id.* at 11. The district court rejected the Snyders' contention that this finding, in particular, lacked support in the record and was thus clearly erroneous. The court pointed out that Robert Snyder himself had acknowledged at least some use of the equipment by Rodel and DAR between 1987 and 1992, and Errol Brewer admitted that he had used the equipment in 1987. *Id.* at 12. Moreover, the corporations had purchased little, if any, new machinery, suggesting that they did indeed rely on the Snyders in that regard. *Id.* As for consideration, Kevin Uden, the Agribank officer who administered the Snyders' loan, had examined the financial statements of the Snyders, Rodel, and DAR and concluded that the Snyders had provided not only their equipment but their labor and expertise to Rodel and DAR virtually free of charge. *Id.*

The district court also found no clear error in the bankruptcy court's finding that the Snyders had acted with the intent to hinder, delay, or defraud one or more of their creditors. *Id.* at 14–21. The fact that the debtors had provided their land, equipment, and services to Rodel and DAR for below-market or no compensation supported the inference that they acted with the intent to defraud. *Id.* at 16. This was particularly true, in the district court's view, where the nominal head of one of the two corporations that benefitted from these transfers—Robert and Delbert's father, Alden—was completely ignorant of the corporation's existence. That circumstance confirmed that the "transaction between Rodel and the Snyder Brothers was not done at arms-length." *Id.* (footnote omitted). Lending further confirmation to that point was the familial relationship between

the parties—DAR and Rodel were both owned by relatives of Robert and Delbert. *Id.* at 17–18. Finally, the steep rise in the fortunes of the two companies closely paralleled the drop in the Snyders' reported incomes:

> Robert Snyder's gross trucking income was $68,000 in 1985, increased to $100,000 in 1987, and then fell to practically nothing in 1988. However, Mr. Uden testified that DAR's trucking income increased "very significantly" [from approximately $59,000 to $388,241] from 1987 through 1992.
>
> Similar to the trucking income, the Snyder Brothers' combined gross income was very high prior to 1988. Their 1985 combined income was $687,000; in 1986; it was $829,000; in 1987, gross income fell to $347,000. However, in 1988, their gross income plummeted to $32,500. Rodel and Dar's combined gross income was $595,000 in 1987, the year of their incorporation, and then grew significantly through 1992 [when it reached $1.2 million]. . . .

Order at 18–19 (footnotes and record citations omitted). This income disparity was indicative of a scheme through which the debtors "cease[d] making payments on their debts, while retaining through their family a highly profitable farming operation." *Id.* at 19.

The district court rejected the Snyders' contention that the below-market rents they had charged Rodel and DAR were inconsistent with fraudulent intent because, among other things, the rents at all times had been disclosed to the creditors and no objection was voiced. *Id.* at 2021. The court noted that the argument had not been made to the bankruptcy court and had thus been waived. *Id.* at 20. In any event, the creditors had done nothing to expressly or implicitly relinquish their right to object to the rents charged, in the court's view, and thus were not barred from arguing them as a basis on which a discharge should be denied to the debtors. *Id.* The court also noted that the late rent payments had not come to light for four to five years after they were due. *Id.* at 21. The district court therefore affirmed the bankruptcy court's decision to deny the Snyders a discharge.

## II.

At this second level of appeal, the Snyders repeat many of the same arguments they made to the district court. They insist that there is no evidence in the record establishing that they allowed Rodel and DAR to use their farming equipment without compensation. They reiterate that the below-market rents they charged to the corporations for the lands that they owned were not indicative of an intent to shortchange their creditors. They argue that no creditor was harmed. They suggest that the bankruptcy court erred in attaching significance to Alden Snyder's lack of knowledge about Rodel and to the rents that were discovered to be overdue shortly before trial. And, finally, they renew their contention that the evidence collectively does not support the bankruptcy court's finding that they acted with the intent to delay, hinder, or defraud their creditors.

We are dismayed to note at the outset that nowhere in their brief do the Snyders so much as mention what the district court had to say about these issues. They quote at length from the bankruptcy court's opinion and refer to it throughout their brief, and they ask us to "reverse the Order of the Bankruptcy Court and its affirmation by the District Court" (Snyder Br. at 10, emphasis ours). Nowhere, however, do they address any of the reasons that the district court gave for affirming the bankruptcy court's decision in its twenty-one-page order. In fact, all but two pages of the argument section of the Snyders' appellate brief were simply copied verbatim from the brief they filed below. Compare Snyder Br. at 12–21 with R. 4 at 6–16.

 This is unacceptable. Granted, when we hear bankruptcy appeals, our review is not confined to the district court's findings alone, but extends to the bankruptcy court's findings as well. E.g., *In re UNR Indus., Inc.,* 986 F.2d 207, 208 (7th Cir.1993). Indeed, we employ the same standard of review that the district court did. *In re Platter,* 140 F.3d 676, 678 (7th Cir.1998). But we have never suggested that it is appropriate for the parties to brief and argue a bankruptcy ap-

peal, or for us to decide the appeal, as if the district court had never spoken. Judge McDade gave the debtors' arguments thorough and independent consideration; his order notes, in fact, that he chose to affirm the bankruptcy court's decision "for slightly different reasons" than the bankruptcy court had articulated. D. Ct. Order at 10. The debtors' failure to confront those reasons in the briefing does a disservice to the time and attention the judge gave their appeal below, and it leaves us in the dark as to where the debtors believe the district court erred in its own analysis of the evidence. Given the extensive analysis that the district court and the bankruptcy court have already devoted to the debtors' arguments, and because we conclude that the bankruptcy court's judgment is amply supported by the record, our own discussion shall be brief.

■ First, we do not find the record devoid of evidence supporting the bankruptcy court's finding that the Snyders permitted Rodel and DAR to use their farm equipment without adequate compensation. As the district court pointed out, Errol Brewer, the owner of DAR, acknowledged some use of the debtors' equipment in 1987, the year before the Snyders declared bankruptcy. D. Ct. Order at 12, citing Tr. 39–40, 59. Even if we turn our attention to later years, as the debtors urge us to do (Snyder Br. at 12),[1] there remains Uden's testimony that the corporations appeared to have enjoyed the benefit of the debtors' machinery nearly free of charge. Tr. 115. Uden had examined the very custom farming agreement between the debtors and DAR to which the Snyders draw our attention (Snyder Br. at 12–13); he also examined the debtors' tax returns for the three years in which the debtors reported the bulk of the income they earned pursuant to that agreement. Based on his familiarity with these types of custom farming arrangements, Uden concluded that the $45 per acre the Snyders had charged DAR was some $35

per acre less than it should have been for the work they performed. Tr. 113. Uden also found it significant that the corporations' tax returns during this time period reflected neither the depreciation nor interest expenses one would have expected to see for the machinery necessary to farm the 1,500 to 2,000 acres that DAR and Rodel were leasing. Tr. 114–15. These circumstances led Uden to conclude that "there was a line of equipment, as well as labor and expertise, that [were] being utilized by the corporations practically free of charge." Tr. 115. The Snyders do not address Uden's testimony.[2] Nor do they address the testimony of Robert Snyder, who admitted that the corporations made at least some use of the debtors' equipment beginning in 1987 and as late as 1992. Tr. 76–78. As the district court noted, the bankruptcy court was not required to accept Snyder's characterization of that use as de minimis (D. Ct. Order at 12), particularly in light of the other evidence giving rise to the inference that the use was substantial.

■ Arguments concerning the below-market rates that the debtors charged Rodel and DAR for the land they owned have been waived. The Snyders do not challenge the bankruptcy court's finding that they received less than fair-market rent, conceding that this finding is supported by the record. Snyder Br. at 14. Instead, they suggest that because the rents they charged the corporations amounted to ninety percent of the lowest fair-market value, they were still reasonable and thus inconsistent with an intent to hinder, delay, or defraud creditors. Furthermore, because the rents were at all times disclosed to the creditors and no contemporaneous objection was voiced, the Snyders maintain that these rents cannot be characterized as fraudulent. The district court noted that neither argument had been made to the bankruptcy court, and consequently both had been waived. D. Ct. Order at 20. The

1. The Snyders suggest that pre-petition use of their machinery was never at issue in the bankruptcy proceedings. (Snyder Br. at 12.)

2. As the bankruptcy court noted, the record does not supply a basis on which one can allocate the underpayment that the Snyders received for their custom farming work between labor and capital. Bankr.Op. at 18. Although the court was therefore unable to quantify the payments that should have been made to the estate for the use of the machinery, it did find the evidence sufficient to establish significant, uncompensated use by Rodel and DAR. *Id.* at 18, 23.

Snyders do not challenge that determination. We have no need, therefore, to reach the merits of these arguments.

■ At several points in their brief, the Snyders point to a lack of evidence that any creditor was harmed by the transfers of property at issue; yet, they have not demonstrated why such harm must be demonstrated before the court may deny the debtor a discharge under section 727(a)(2). The statute merely requires that the debtor transfer property "with intent to hinder, delay or defraud" a creditor. 11 U.S.C. § 727(a)(2) (emphasis supplied). We ourselves have stated unequivocally that "proof of harm is not a required element of a cause of action under Section 727." *In re Smiley*, 864 F.2d 562, 569 (7th Cir.1989) (collecting cases); see also *In re Krehl*, 86 F.3d 737, 744 n. 4 (7th Cir.1996). The Snyders cite *Smiley* where it suits them (Snyder Br. at 19) but make no argument that we were mistaken in this respect.

■ The bankruptcy court's finding that the Snyders acted with an intent to delay, hinder, and defraud rested upon, among other circumstances, Alden Snyder's ignorance about Rodel, the company that he purportedly owned and headed, and the fact that some of the rents that the Snyders had charged Rodel and DAR for their lands had remained unpaid for years (Bankr.Op. at 22, 23). We find no error in the bankruptcy court's reliance upon these particular factors. Although Alden Snyder was eighty-eight years old and in failing health when deposed, his physician had previously testified that he was alert, able to answer questions, and coherent. Tr. Aug. 30, 1994 at 11, 20–21. His credibility as a witness was a matter for the bankruptcy court to assess as the finder of fact. See Bankruptcy Rule 8013. Having ourselves reviewed the videotape of Mr. Snyder's testimony, we believe it was a fair inference that his lack of recollection regarding Rodel was due not to a fault in memory, but instead to a

near-total lack of involvement with the corporation. That in turn suggests that Rodel and DAR were not independent corporations operating at arms length with the debtors, but tools that the Snyders used to divert income from the estate.[3] As for the rents that remained unpaid for four or five years, the debtors plead ignorance, emphasizing the lack of evidence that their failure to collect the payments in a timely fashion "was anything more than an oversight." Snyder Br. at 17. However, the lengthy delay in payment, even if inadvertent, suggests a casual relationship between the debtors and the two corporations. That is precisely the inference that the bankruptcy court drew when it noted that the unusual manner in which the rents were paid indicated that the parties were not dealing at arms length. Bankr.Op. at 23.

Cumulatively, the evidence lends ample support to the bankruptcy court's finding that the Snyders acted with the requisite intent to delay, hinder, or defraud their creditors and/or the trustee. This finding is one of fact, of course, and our review accordingly is limited to a search for clear error. *Krehl*, 86 F.3d at 743. Actual intent to hinder, delay, or defraud a creditor or officer of the estate must be shown before the debtor may be discharged under section 727(a)(2). *Id.* "Because direct evidence of a debtor's intent usually will be unavailable, it may be inferred from the circumstances surrounding his objectionable conduct." *Id.*, citing *Smiley*, 864 F.2d at 566. We have already recounted in our summary of the findings below the factors upon which the bankruptcy and district courts relied in concluding that the debtors acted with the intent that the statute requires. Supra at 598–99. We need not recite all of those circumstances a second time. Nothing that either court cited was an inappropriate or irrelevant factor; and having reviewed the record, we are satisfied that each of the cited circumstances was borne out by the evidence. By no means can we

**3.** "It defies logic," the Snyders suggest, "to believe that a debtor intending to defraud his creditors would create a corporation to conceal his assets and then place the stock in the name of a third party, who was either incapable of understanding the transaction or was never informed of its existence." Snyder Br. at 17. It makes perfect sense to us, however. Naming an unwitting and unsophisticated relative as the titular head of a corporation used to effectuate a fraud is an all too familiar scenario.

602

describe the bankruptcy court's determination that the Snyders acted with the intent to delay, hinder, or defraud their creditors (or the district court's affirmance of that determination) as erroneous, let alone clearly so. The Snyders effectively transferred property of the estate to two corporations nominally owned and managed by members of their family by charging those corporations below-market rates for the rental of their lands and little or nothing for the use of their farming equipment. The debtors in turn began to work for the corporations, reporting incomes that sufficed only to meet their living expenses, even as the corporations themselves prospered. From these and the other circumstances noted by the courts below, one can readily and reasonably infer that the debtors were retaining through their family members income that would otherwise have been allocated to their debts.

## III.

Finding no error in the thorough analyses of the bankruptcy and district courts, we AFFIRM the decision to deny the debtors a discharge pursuant to section 727(a)(2).