**UNITED STATES OF AMERICA,**
**Plaintiff–Appellee,**

v.

**Eri H. GARCIA, Defendant–Appellant.**

**No. 99–3445.**

United States Court of Appeals,
Seventh Circuit.

Argued March 31, 2000.
Decided Feb. 23, 2001.

Before Hon. POSNER, Hon. RIPPLE, and Hon. ILANA DIAMOND ROVNER, Circuit Judges.

### ORDER

After their own arrests for narcotics trafficking, Eri Garcia's co-conspirators led the authorities to him. A grand jury indicted Garcia for conspiring to distribute (and to possess with the intent to distribute) cocaine in violation of 21 U.S.C. § 846. After a two-day trial, a jury convicted him on this charge, and the district court ordered him to serve a term of 200 months in prison. R. 54. Garcia appeals, arguing (1) that the district court abused its discretion when it entered a protective order that precluded him from having physical possession of the materials produced in discovery; (2) that the prosecution made improper references to his nationality during trial; (3) that the district court erred in allowing a government agent to recount certain hearsay statements in his testimony; (4) that the amount of cocaine attributed to him at sentencing lacks the support of the record; and (5) that the district court abused its discretion when it refused to depart downward based on the fact that he is subject to deportation. Finding no merit in any of these contentions, we affirm.

1.

Before complying with its discovery obligations, the government requested the district court to issue a protective order so as to protect the safety of individuals who were cooperating with the government in ongoing investigations. R. 12. With Garcia's consent, *see* Final Pre-trial Conference Tr. at 4–6, the court subsequently entered an order that directed Garcia's counsel "not to give his client actual copies of the discovery, whether redacted or not, but simply to share all relevant information with his client as he feels is necessary to prepare his case." R.13. The order also directed counsel to notify the court if he believed that the limitation would in any way compromise his ability to prepare for trial. *Id.* Garcia contends that this order was overbroad, limited his ability to participate in the preparation of his defense, and did not, in fact, serve to protect the gov-

ernment's informants. We need not reach the merits of this issue, however. By consenting to this order below, Garcia has waived any objection to its terms. *See generally United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993); *see also, e.g., United States v. Richardson,* 238 F.3d 837, 840 (7th Cir.2001); *United States v. Staples,* 202 F.3d 992, 995 (7th Cir.2000). We note further that although the order directed Garcia's counsel to alert the court to any problems with the protective order, none were ever raised.

2.

Before the trial commenced, Garcia filed a motion *in limine* that sought, *inter alia,* to preclude references to his immigration status. R. 14 at 1 ¶ 1. Although Garcia had obtained a permit to work in this country and had applied for permanent resident alien status, it also appears that he had entered the United States illegally. *See* R. 8, detention order at 3–4 ¶¶ 4–5, Trial Tr. v.1 at 172–73. In its response to the motion, the government indicated that it would not comment directly upon Garcia's immigration status. R. 15 at 1–2, ¶ 2. The government pointed out, however, that there would be testimony that Garcia's alleged co-conspirators knew him as "the 'white' Colombian with whom they agreed to deal in cocaine." *Id.* ¶ 2. (Garcia's co-conspirator, Enrique Colon, was known as the "black" Colombian.) Based on the government's representation that it would not refer to Garcia's immigration status, the district court denied this portion of Garcia's motion as moot. Trial Tr. v.1 at 4. During its opening statement, the government noted on several occasions that Garcia was known to his co-conspirators, and became known to its informant, as "the white Colombian." Trial Tr. v.1 at 59, 61, 62. Garcia contends that these references to his nationality unfairly prejudiced him.

■ Garcia did not object to these references at trial, however, and consequently, as his counsel acknowledges, Garcia Br. 8., our review is for plain error alone. *E.g., United States v. Clarke,* 227 F.3d 874, 884 (7th Cir.2000), *cert. denied,* — U.S. ——, 121 S.Ct. 1165, 148 L.Ed.2d 1024 (2001); *see* Fed.R.Crim.P. 52(b). We find no plain error. In the first instance, Garcia's argument assumes that nationality and immigration status have the same meaning, and thus that the government, in agreeing not to refer to his immigration status, necessarily agreed not to mention his nationality as well. The two terms have distinct meanings, however—the former refers to the country of which one is a citizen, whereas the latter refers to the existence and nature of his right to be present in this country—and the government's response to his motion made clear that indeed there would be references to Garcia's nationality at trial. The government therefore in no way misled either Garcia or the court. Second, although Garcia broadly contends that these references "so infected the trial with unfairness as to make conviction a denial of due process" (Garcia Br. 10), the record does not bear out that contention. The references were not gratuitous, they were not improperly highlighted, and in no way did the government seek to have the jury draw any improper references from Garcia's nationality.

3.

■ Herbert Patterson was one of the first members of the conspiracy to be arrested. Following his arrest, Patterson traveled to Texas with DEA special task force detective Jerry Simon in an effort to locate and arrest Garcia and co-conspirator Enrique Colon. In furtherance of that

effort, Simon had Patterson page Garcia, whom Patterson knew as "Eddie," and arrange a meeting at a Houston restaurant. Over Garcia's objection, the district court permitted Simon to testify that while he and Patterson were awaiting Garcia's arrival at the restaurant, Patterson received a telephone call from "Eddie" and that as a result of that telephone conversation, their meeting was moved to a McDonald's down the street. Simon further testified that after he and Patterson drove to McDonald's, Patterson received a second telephone call from "Eddie." It seems that Garcia's suspicions were aroused after he spotted some of the same people at McDonald's that he had seen at the first restaurant; and consequently, Garcia refused to meet with Simon and Patterson on that occasion. Trial Tr. v.1 at 101–02. (Garcia was eventually lured to an INS office on a ruse and was arrested there.) He contends that the testimony regarding Patterson's telephone calls from "Eddie" amounted to improper hearsay, and was particularly inappropriate given that Patterson himself testified at trial.

We find no abuse of discretion in the admission of this testimony, however. The detective was permitted to recount Garcia's statements, as recounted by Patterson, not for the truth of the matter asserted in those statements, but in order to explain the course of the agent's investigation—specifically, his unsuccessful efforts to locate and arrest Garcia. It was within the district court's discretion to allow the testimony for this limited purpose. *See, e.g., United States v. Linwood,* 142 F.3d 418, 425 (7th Cir.), *cert. denied,* 525 U.S. 897, 119 S.Ct. 224, 142 L.Ed.2d 184 (1998); *United States v. Akinrinade,* 61 F.3d 1279, 1283 (7th Cir.), *cert. denied,* 516 U.S. 999, 116 S.Ct. 541, 133 L.Ed.2d 444 (1995). We note that Patterson himself later testified concerning the same telephone calls, Trial Tr. v.1 at 148–51, and he and Simon both were subject to cross-examination as to the nature and context of the conversations. *See Akinrinade,* 61 F.3d at 1283.

### 4.

■ In the pre-sentence report, the probation officer determined that Garcia's relevant conduct as a member of the narcotics conspiracy involved the distribution of between 25 and 30 kilograms of cocaine. R. 51 ¶¶ 11, 17, 23; *see* U.S.S.G. § 1B1.3(a)(1)(B) (1998). The probation officer's determination was based largely on information supplied by co-conspirator Herbert Patterson, who told authorities, and later testified at trial, that over the 1.5–year life of the conspiracy, he had received between 25 and 30 kilograms of cocaine from "Eddie" (*i.e.,* Garcia) and "Richard" (Garcia's co-conspirator Enrique Colon). *See* R. 51 ¶¶ 11, 17; Trial Tr. v.1 at 141.

Garcia objected to the 25–to–30 kilogram quantity. He made two principal arguments in that regard. *First,* although Patterson had testified to receiving a total of 25 to 30 kilograms of cocaine from "Eddie" and "Richard," his testimony did not specify whether each distribution was from Garcia and Colon jointly, and if not, what total quantity of the narcotic he had received from Garcia. Moreover, although Patterson had characterized Garcia as Colon's partner, *see* R. 51 ¶ 11, he had also testified at one point in the trial that "basically Eddie was a runner." Trial Tr. v.1 at 154. That testimony, which in Garcia's view was inconsistent with the notion of a partnership between himself and Colon, suggested that he should be held accountable for something less than the full 25 to 30 kilograms Patterson claimed to have received from the two men. *Second,* Colon at one point in his testimony said that he had conspired to distribute some 15 to 20 kilograms of cocaine. Trial Tr. v.1 at

163. In Garcia's view, after subtracting from that amount a 7- to 10-kilogram quantity of cocaine that Colon had distributed to another individual before the relationship with Patterson began, there remained a maximum of 8 to 10 kilograms for which he could be held to account.

The probation officer found no merit in either of Garcia's arguments. The officer noted that Patterson had consistently reported to receiving a total of 25 to 30 kilograms from Garcia and Colon. R. 51 Addendum at 1–2, Response to Objection Nos. 2 & 3. Patterson's reference to "Eddie" being "a runner" was not a description of Garcia's role in the conspiracy, but rather an explanation as to who had delivered the cocaine that was found in Patterson's home at the time of his arrest. *Id.* at 1, Response to Objection No. 2. As for Colon's testimony, the officer noted that Colon had not testified to having distributed 15 to 20 kilograms of cocaine, but rather to having had 15 to 20 business dealings with Patterson. *Id.* at 2, Response to Objection No. 3.

Based on his own recollection of the trial testimony, the district judge overruled Garcia's objection to the relevant drug quantity. He too recalled that Colon acknowledged 15 to 20 business dealings with Patterson, as opposed to having distributed at total of 15 to 20 kilograms of cocaine. Sentencing Tr. at 11. There was "ample evidence," in the district judge's view, that the conspiracy involved large amounts of cocaine, and he believed the 25 to 30 kilogram estimate was, in fact conservative. *Id.* The judge also noted that Garcia could point to no evidence that the full amount of 25 to 30 kilograms that were distributed to Patterson was not foreseeable to him. *Id.* The court therefore adopted the probation officer's findings and held Garcia responsible for the 25 to 30 kilogram quantity, *id.*, a determination which increased Garcia's base offense level, *see* U.S.S.G. § 2D1.1(c)(3).

On appeal, Garcia has simply repeated the objections he made below, largely ignoring the reasons that the probation officer and the district judge gave for overruling his objections. *Compare* Garcia Br. at 11–16 with R. 48 at 4–8. This is a practice of which we disapprove. *See In re Snyder,* 152 F.3d 596, 599–600 (7th Cir.1998). After our own review of the record, we find no clear error in the calculation of the drug quantity. *See, e.g., United States v. Albarran,* 233 F.3d 972, 979 (7th Cir.2000) (drug quantity for which defendant is responsible is a finding of fact we review for clear error). Patterson's testimony amply establishes that the distributions of cocaine he received from Garcia and Colon totaled 25 to 30 kilograms. Trial Tr. v.1 at 141, 152. Colon's recollection of the transactions with Patterson is, in general, consistent with Patterson's. As both the probation officer and the district court pointed out, Colon testified on direct examination that he had conducted some 15 to 20 transactions with Patterson. Trial Tr. v.1 at 159. It is true that on cross-examination, when asked how many kilograms of cocaine he had conspired to distribute, Colon said, "I recall 15 to 20." *Id.* at 163. But neither party went into any detail with Colon regarding the number and frequency of his transactions with Patterson or the amounts of cocaine involved. By contrast, Patterson's pre-trial proffer, which was recounted in the pre-sentence report, was much more specific in these respects, and consistent with Patterson's trial testimony that proffer indicated that Colon and Garcia had distributed between 25 and 30 kilograms of cocaine to him. *See* R. 51 ¶¶ 11, 17.[1]

---

1. Colon's own proffer was also summarized in the pre-sentence report, and a copy of the

Insofar as Garcia's individual culpability for that amount is concerned, the record fully supports the inference that Garcia indeed was Colon's partner in all of the dealings with Patterson, and thus that the full amount was foreseeable to him. Both Patterson and Colon described the distributions to Patterson in terms which indicated that these were joint distributions from Colon and Garcia. *See* Trial Tr. v.1 at 141, 152, 159, 160. And, as the probation officer pointed out, Patterson's reference to Garcia being a "runner" was solely an explanation for how Patterson had come to be in possession of the cocaine found in his possession at the time of his arrest. Trial Tr. v.1 at 153–54.

### 5.

■ Finally, Garcia asked the district court to depart downward from the sentencing range based on the fact that he is subject to deportation following the completion of his prison term. R. 47 ¶ 12, R. 48 at 13–17; *see United States v. Farouil,* 124 F.3d 838, 847 (7th Cir.1997). The district court denied his request. Sentencing Tr. at 31. Although the district court's exercise of discretion in refusing to depart downward is not subject to appellate review, *e.g., United States v. Ofcky,* 237 F.3d 904, 906 at *5 (7th Cir. Jan. 23, 2001), Garcia contends that in this case, the court erroneously believed that it lacked the authority to depart, and that we should vacate the sentence and remand for reconsideration on that basis, *see id.*

The record discloses that the district court was fully aware of its ability to depart. Garcia, in fact, had cited our opinion in *Farouil* and like opinions from other courts indicating that one's status as a deportable alien may warrant a downward departure when the status results in an unusual or exceptional hardship in terms of the severity of the sentence. *See* R. 48 at 15–17. At sentencing, the district judge entertained arguments from both sides as to the propriety of a downward departure. In the end, the judge concluded, in the exercise of his discretion, that a departure was not warranted:

> I believe it is correct that under certain circumstances this Court may consider a situation like this as grounds [for departure] ... if there is, in fact, ... a fortuitous increase in the severity of the sentence as a result of this [INS] detainer, but I find nothing here that would constitute such an undue hardship that would warrant my granting the defendant's motion, and it is denied.

Sentencing Tr. at 31. We are without authority to review this determination.

For all of these reasons, Garcia's conviction and sentence are AFFIRMED.

---

proffer was submitted to the district court at sentencing. *See* R. 51 ¶ 20; R. 53. Like Colon's trial testimony, the proffer lacked many of the specifics that Patterson's testimony and proffer supplied. In particular, Colon recalled fewer transactions than Patterson did. But we find nothing in Colon's proffer or his testimony that suggests Patterson was inaccurate in estimating that Garcia and Colon sold him a total of 25 to 30 kilograms. The proffer itself indicates that Colon spoke broken English, and apparently he did not have the aid of an interpreter at the proffer.