**In re Randy L. HAMMITT, Debtor.**

**Interstate Producers Livestock Association, an Illinois corporation, Plaintiff,**

**v.**

**Randy L. Hammitt, Defendant.**

**In re Patricia Lynn Hammitt, Debtor.**

**Interstate Producers Livestock Association, an Illinois corporation, Plaintiff,**

**v.**

**Patricia Lynn Hammitt, Defendant.**

**Bankruptcy Nos. 99–72074, 00–72188. Adversary Nos. 99–7182, 00–7131.**

United States Bankruptcy Court, C.D. Illinois.

Oct. 5, 2001.

**674**

Thomas W. O'Neal, Peoria, IL, for creditor.

Frank E. Hoffman, Bloomington, IL, for debtor.

## OPINION

LARRY L. LESSEN, Bankruptcy Judge.

Interstate Producers Livestock Association ("IPLA") objects to the discharge of Defendants Randy Hammitt, pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), and (a)(5) and to Defendant Patricia Hammitt pursuant to 11 U.S.C. §§ 727(a)(3) and (a)(5). In addition, IPLA objects to the dischargeability of its debt pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6). All of IPLA's theories for relief are concerned in one way or another with the alleged loss of 129 head of cattle from Defendants' cattle operation.

The Defendants, who were married, started a livestock operation in the late 1980s. Mr. Hammitt took care of the cattle, and Mrs. Hammitt took care of the books. The cattle operation was a side business; both Defendants worked full time at State Farm Insurance Company. Both Defendants are educated; Mrs. Hammitt has a bachelor's degree in sociology and Mr. Hammitt has an associate's degree in agricultural production.

The Defendants did not pick an opportune time to enter the cattle business. Cattle prices were generally depressed during the time that they operated their cattle business. The cattle operation lost money every year, over $400,000 from 1992 to 1998. The Defendants never received any wages from their cattle operation. Instead, they were required to put over $100,000 of their non-farm income from their State Farm employment into the cattle operation. In addition, they borrowed over $100,000 from Mrs. Hammitt's father, most of it in the last year of operation for the cattle business, to keep the business afloat. Neither the Defendants nor Mrs. Hammitt's father were ever repaid any monies that they contributed to the cattle operation.

In 1996, the Defendants tried to regroup from their prior losses by entering into consignment contracts with IPLA. Under the IPLA custom feed program, IPLA would own the cattle, and the farmer would take care of them. When the cattle were sold, IPLA would take the total proceeds, deduct the cost of the cattle sold, a $5 per head fee, and an interest charge. Any money left ever would then go to the farmer.

Between September 9, 1996, and October 20, 1998, the Defendants entered into twelve separate contracts with IPLA. Both sides agree that 1,290 cattle were purchased under these contracts. The Defendants complied with the first eleven contracts. However, they came up 129 cattle

short on the final contract. IPLA alleges that the Defendants misappropriated the cattle; the Defendants claim that IPLA miscounted the cattle.

The Defendants separated in February, 1999, and divorced in September, 2000. The Defendants filed separate petitions in bankruptcy. Hence, IPLA has filed two adversary complaints. Adversary number 99–7182 names Mr. Hammitt as the Defendant. Count I [§ 727(a)(2)] alleges that 129 head of IPLA cattle were concealed from IPLA within one year of the filing of Mr. Hammitt's petition. Count II [§ 727(a)(3)] alleges that Mr. Hammitt failed to keep or preserve recorded information regarding the disposition of the 129 cattle. Count III [§ 727(a)(5)] alleges that Mr. Hammitt failed to make a satisfactory explanation of the loss of 129 cattle. Count IV [§ 523(a)(2)(A)] alleges that Mr. Hammitt defrauded IPLA by concealing the loss of 129 cattle prior to entering into the final IPLA contract. Count V [§ 523(a)(2)(A)] alleges that it would not have made its last custom feed payment to the Defendants if it had known of the loss of the 129 cattle. Finally, Count VI [§ 523(a)(6)] alleges conversion. Adversary number 00–7131 names Mrs. Hammitt as the Defendant, and it is substantially the same as the adversary against Mr. Hammitt except for the fact that IPLA does not make an allegation against Mrs. Hammitt under § 727(a)(2). [Mrs. Hammitt's filing date was more than a year after the alleged loss of the cattle.]

 A discharge provided by the Bankruptcy Code is to effectuate the "fresh start" goal of bankruptcy relief. In exchange for that fresh start, the Bankruptcy Code requires debtors to accurately and truthfully present themselves before the Court. A discharge is only for the honest debtor. *In re Garman,* 643 F.2d 1252, 1257 (7th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). Consequently, objections to discharge under 11 U.S.C. § 727 should be liberally construed in favor of debtors and strictly against objectors in order to grant debtors a fresh start. *In re Johnson,* 98 B.R. 359, 364 (Bankr.N.D.Ill.1988) (citation omitted). Because denial of discharge is so drastic a remedy, courts may be more reluctant to impose it than to find a particular debt nondischargeable. *See Johnson, supra,* 98 B.R. at 367 ("The denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor.") (citation omitted). The plaintiff has the burden of proving the objection. *See* Fed. R.Bankr.P. 4005; *In re Martin,* 698 F.2d 883, 887 (7th Cir.1983) (the ultimate burden of proof in a proceeding objecting to a discharge lies with the plaintiff). The objector must establish all elements by a preponderance of the evidence. *In re Scott,* 172 F.3d 959, 966–67 (7th Cir.1999).

Pursuant to 11 U.S.C. § 727(a)(2)(A), a court will grant a debtor a discharge unless the plaintiff can prove by a preponderance of the evidence that the debtor:

> (2) with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
>> (A) property of the debtor, *within one year before* the date of the filing of the petition...

11 U.S.C. § 727(a)(2)(A) (italics added).

 Denial of discharge under this section requires proof of actual intent to hinder, delay or defraud a creditor. *In re Snyder,* 152 F.3d 596, 601 (7th Cir.1998); *In re Krehl,* 86 F.3d 737, 743 (7th Cir. 1996); *In re Smiley,* 864 F.2d 562, 566 (7th Cir.1989). "[P]roof of harm is not a re-

quired element of a cause of action under Section 727." *Id.* at 569. In determining whether a debtor has acted with intent to defraud under § 727, the court should consider the debtor's "whole pattern of conduct." *In re Ratner,* 132 B.R. 728, 731 (N.D.Ill.1991) (*quoting In re Reed,* 700 F.2d 986 (5th Cir.1983)). The issue of a debtor's intent is a question of fact to be determined by the bankruptcy judge. *See Smiley, supra,* 864 F.2d at 566. Actual fraudulent intent can be inferred from extrinsic evidence. *Id.; Krehl, supra,* 86 F.3d at 743; *In re White,* 63 B.R. 742, 744 (Bankr.N.D.Ill.1986) ("a debtor is unlikely to directly testify that his intent was fraudulent, the court may deduce fraudulent intent from all the facts and circumstances of a case"). "Thus, where the evidence on the intent question is such that two permissible conclusions may rationally be drawn, the bankruptcy court's choice between them will not be viewed as clearly erroneous." *Krehl, supra,* 86 F.3d at 744 (citation omitted). "Intent to defraud involves a material misrepresentation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *In re Chavin,* 150 F.3d 726, 728 (7th Cir.1998) (citations omitted).

In order to prevail against Mr. Hammitt on its § 727(a)(2)(A) claim, IPLA must prove two things: (a) cattle were transferred, removed, destroyed, mutilated, or concealed, and, if so proven, (b) that Mr. Hammitt had an intent to hinder, delay, or defraud his creditors.

■ In order to determine whether any cattle were missing, it is first necessary to determine how many IPLA cattle the Hammitts had to begin with. Unfortunately, neither IPLA, the Hammitts, nor Commerce Bank (another secured lender), counted the cattle. It is undisputed that the IPLA contracts indicated that 1290

head of cattle were charged to the Hammitts. However, IPLA witnesses admitted that they never counted the cattle charged to the Hammitts when they were loaded up in North Dakota or when they were delivered to the Hammitts' farm. The Hammitts were often not at home when the cattle were delivered to their farm. Because the cattle had been traveling for many hours, they were released immediately upon arrival at the Hammitt farm for health reasons. Thus, the Hammitts were unable to count how many cattle were actually delivered to the farm.

IPLA witnesses also admitted that they never counted the cattle while they were on the Hammitt farm. A number of cattle died on the Hammitt farm, but it is unclear how many died. IPLA expected a negligible death loss, perhaps up to 2%. Mr. Hammitt testified that his death loss was closer to 4%. He explained that he was using very young heifers that were more susceptible to death at a young age. However, he admitted that he did not keep records of the cattle deaths. In addition, he did not tell Mrs. Hammitt about the deads or other problems with the cattle because he did not want to bring any more trouble to an already troubled marriage. Only 21 deads were reported to IPLA, even though Mr. Hammitt estimated that he had 96 deads over a two-year period.

IPLA witnesses further admitted that they did not count the cattle before, during, or after any sales. For example, the last sale of cattle was in February, 1999, at the Reel Sale Barn. Reel recorded 390 head of Hammitt cattle were sold. However, IPLA only credited the Hammitts with 325 head of cattle. IPLA witnesses admitted that its 325 figure was not based on a head count by IPLA, Reel, or the Hammitts. Instead, IPLA based its number on the amount that was derived from the sale. (Total dollar amount from sale

divided by the dollar amount that an individual head should have brought at the sale equals the number of cattle credited to the Hammitts.) The Court is not convinced that this is the best way to keep track of the cattle. The Court also finds it interesting that IPLA kept 100% of the proceeds from the February, 1999, sale even though it claimed that 65 of the cattle were non-IPLA cattle.

The Hammitts produced documents providing a detailed listing of their sales of cattle from 1992 to 1998. The Hammitts did not have detailed listings for the last two sales in December, 1998, and February, 1999, due in part to the farm's future and their marital separation, but documents from IPLA and the Reel Sale Barn filled in the gap. The evidence showed that the Hammitts sold 1,568 head of cattle from 1996 to 1999, a number far in excess of the number of cattle charged to the Hammitts by IPLA during this period.

IPLA admitted that it did not have any evidence that the Hammitts sold or transferred any IPLA cattle to parties other than those listed in their own reports. There was no evidence that the Hammitts sold cattle under another name. The Hammitts consistently testified that no IPLA cattle were ever transferred to any outside parties; they testified that IPLA received all of the proceeds from the sale of IPLA cattle.

IPLA has failed to prove that the Hammitts transferred, removed, destroyed, mutilated, or concealed 129 cattle. In the absence of any direct evidence that the Hammitts misappropriated the 129 cattle, IPLA relied solely on the numbers found in 12 IPLA contracts and its interpretation of the sales records. The Court found these numbers to be too fuzzy to support IPLA's theory of 129 missing cattle. The Court believes that the alleged shortfall is just as likely due to miscounting by IPLA

or cattle deaths rather than to any wrongdoing by the Hammitts.

In any event, the Hammitts did not have the intent to defraud IPLA. The Hammitts put everything they had into the cattle operation. They took no compensation from the cattle business; everything was reinvested into the business. In addition, the Hammitts put in their own money from their off-farm employment to keep the business going. The Hammitts worked extremely hard at the cattle operation. All of their efforts were designed to keep the cattle operation running. The Hammitts did not intend to defraud IPLA.

Section 727(a)(3) of the Bankruptcy Code provides as follows:

(a) the court shall grant the debtor a discharge unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

■■■■■ The statute places an affirmative duty on the debtor to create books and records accurately documenting his business affairs. *In re Juzwiak,* 89 F.3d 424, 429 (7th Cir.1996) ("The debtor has the duty to maintain and retain comprehensible records.") (citations omitted). To prevail under a complaint, the plaintiff must prove that the debtor failed to keep adequate records. *In re Martin,* 141 B.R. 986, 995 (Bankr.N.D.Ill.1992); *In re Calisoff,* 92 B.R. 346, 356 (Bankr.N.D.Ill.1988). "Section 727(a)(3) does not require proof of criminal or quasi-criminal conduct; rather, a transfer or removal of assets, a destruc-

tion or other wasting of assets, or a concealment of assets is all the trustee must prove." *Scott, supra,* 172 F.3d at 969. Intent is not an element of proof under § 727(a)(3). *Juzwiak, supra,* 89 F.3d at 430. ("creditors do not need to prove that the debtor intended to defraud them in order to demonstrate a § 727(a)(3) violation"). Every debtor has a duty to take reasonable precautions to maintain and preserve records of their financial transactions and affairs. *In re Carlson,* 231 B.R. 640, 654 (Bankr.N.D.Ill.1999), *aff'd sub nom. Carlson v. Brandt,* 250 B.R. 366 (N.D.Ill.2000) (citation omitted). The purpose of § 727(a)(3) is "to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *Scott, supra,* 172 F.3d at 969. This statute ensures "that trustees and creditors will receive sufficient information to enable them to 'trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions.'" *Juzwiak, supra,* 89 F.3d at 427–28 (*quoting Martin, supra,* 141 B.R. at 995) (citations omitted). The creditors and the trustee are not required to accept a debtor's oral recitations or recollections of his transactions; rather to qualify for a discharge in bankruptcy, a debtor is required to keep and produce written documentation of all such transactions. *Id.* at 429–30. "Records are not 'adequate' if they do not provide the trustee or creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Martin, supra,* 141 B.R. at 995 (citations omitted). The completeness and accuracy of a debtor's records are to be determined on a case-by-case basis, considering the size and complexity of the debtor's business. *In re Bailey,* 145 B.R. 919, 924 (Bankr. N.D.Ill.1992) (citations omitted). The

court should consider the sophistication of the debtor, his business experience, and other relevant circumstances. *Calisoff, supra,* 92 B.R. at 356 (citation omitted).

■ The Hammitts produced eight large expandable folders stuffed with business records from the farm's operations. (These folders had previously been supplied to the Chapter 7 Trustee.) Using these records, Mrs. Hammitt prepared a detailed listing of times and places regarding the sale of cattle from 1992 through 1998. In addition, the Hammitts produced tax returns, cattle sale invoices, and summaries itemizing the number of cattle sold per year, places sold, and type of cattle sold. The Hammitts did not violate § 727(a)(3).

■ Section 727(a)(5) provides that "[t]he court shall grant the debtor a discharge, unless... the debtor has failed to explain satisfactorily... any loss of assets or deficiency of assets to meet the debtor's liabilities...." 11 U.S.C. § 727(a)(5). "Section 727(a)(5) is broadly drawn and clearly gives a court broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *Martin, supra,* 698 F.2d at 886 (citations omitted). There are two stages of proof with respect to § 727(a)(5). *In re Bryson,* 187 B.R. 939, 955 (Bankr.N.D.Ill. 1995). First, the party objecting to discharge has the burden of proving that the debtor at one time owned substantial and identifiable assets that are no longer available for his creditors. *Id.* (citations omitted). Second, if the party objecting to the discharge meets its burden, then the debtor is obligated to provide a satisfactory explanation for the loss. *Id.* (citation omitted).

■ What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is

left to the discretion of the court. *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir.1966); *In re Potter*, 88 B.R. 843, 849 (Bankr.N.D.Ill.1988). The debtor's explanation, however, must consist of more than "a vague, indefinite, and uncorroborated hodgepodge of financial transactions." *Baum, supra*, 359 F.2d at 814. Instead, "it must be a good faith explanation of what really happened to the assets in question." *Potter, supra*, 88 B.R. at 849. "To be satisfactory, the explanation must demonstrate the debtor has exhibited good faith in conducting his affairs and explaining the loss of assets." *Martin, supra*, 141 B.R. at 999 (citations omitted). A debtor "cannot abuse the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation." *Johnson supra*, 98 B.R. at 366 (*quoting Martin, supra*, 698 F.2d at 888).

■ As discussed above, the Court is not convinced that there was a loss of 129 cattle. In any event, the Hammitts have offered a sufficient explanation for the alleged shortfall. There was credible evidence that IPLA did not properly credit the Hammitts with the correct number of cattle sold. Several witnesses described the last two cattle sales as "chaotic"; there was ample opportunity for miscounting at these sales. In addition, the Hammitts explained that there were unreported cattle mortalities over the years. Under these circumstances, the Court finds that the Hammitts have adequately explained the disposition of any missing cattle.

■ Section 523(a)(2)(A) of the Bankruptcy Code states in part as follows:

> A discharge under section 727... of this title does not discharge an individual debtor from any debt... for money, property, services, or an extension, renewal, or refinancing of credit, to the

extent obtained by false pretenses, a false representation, or actual fraud...

11 U.S.C. § 523(a)(2)(A).

In order to prove a case under this provision, courts have traditionally required a plaintiff to prove by a preponderance of the evidence that (i) the debtor made false statements which he knew to be false, or which were made with such reckless disregard for the truth as to constitute willful misrepresentations; (ii) the debtor possessed the requisite *scienter*, i.e. he actually intended to deceive the plaintiff, and (iii) to his detriment, the plaintiff justifiably relied on the representations. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *In re Mayer*, 51 F.3d 670, 673 (7th Cir.1995), *cert. denied* 516 U.S. 1008, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995); *In re Sheridan*, 57 F.3d 627, 635 (7th Cir.1995); *In re Scarlata*, 979 F.2d 521, 525 (7th Cir.1992); *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). However, the Seventh Circuit has recently held that "actual fraud" is not limited to misrepresentation, but may encompass " 'any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another.' " *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir.2000) *quoting* 4 Lawrence P. King, *Collier on Bankruptcy*, ¶ 523.08(1)(e), p. 523–45 (15th ed. Revised, 2000).

IPLA alleges that the Hammitts obtained 276 head of IPLA cattle pursuant to the October 20, 1998, contract by false pretenses. The alleged false pretenses is the Hammitts' failure to report the death loss to IPLA. IPLA argues that it would not have entered into the last contract if the Hammitts had correctly reported the death loss.

The Hammitts concede that they did not accurately report the death loss to IPLA. However, they argue that the omission

was not material, that they did not have the requisite intent to deceive, and that IPLA did not justifiably rely on their omission.

First, it is clear that Mrs. Hammitt did not have the intent to deceive IPLA. Mr. Hammitt was aware of the cattle mortalities, but he did not pass along this information to Mrs. Hammitt because it would have added additional stress to their already failing marriage. Mrs. Hammitt cannot be blamed for not reporting something she did not know. Therefore, her debt to IPLA is dischargeable under § 523(a)(2)(A).

Mr. Hammitt knew about the death loss, but the evidence showed that he kept the information to himself in order to avoid further marital difficulties, not to mislead IPLA. The Court found Mr. Hammitt to be credible when he testified that he did not anticipate a shortfall to IPLA. He attributed the shortfall to the low prices that cattle were bringing at the time of the last two sales rather than to a shortage of cattle. He stated that if the sales were held today, IPLA would be paid in full.

The Court further finds that IPLA did not justifiably rely on Mr. Hammitt's failure to report cattle deaths. Some cattle deaths are expected every year. The lack of any reported deads for over two years should have been a red flag to IPLA. IPLA never made any attempt to physically count the cattle. It appears that IPLA was relying on the Hammitts' successful completion of the first eleven contracts when they entered into the twelfth contract rather than any false representation by the Hammitts.

 Under § 523(a)(6), a discharge in bankruptcy does not discharge a debtor from a debt for "willful and malicious injury by a debtor to another entity or property of another entity." 11 U.S.C. § 523(a)(6). Under the Supreme Court's

decision in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), in order for a debt to be nondischargeable under this provision, it must be a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury. Discussing the standard to be applied in cases involving conversion of collateral under § 523(a)(6) after *Kawaauhau*, the court in *In re Kidd*, 219 B.R. 278, 285 (Bankr.D.Mont.1998), stated:

> [A] creditor, in order to prevail under § 523(a)(6), must demonstrate by a preponderance of the evidence, that the debtor desired to cause the injury complained of, or that the debtor believes that the consequences were substantially certain to result from the debtors (sic) acts. In other words, in the case of a conversion, a creditor must show that a debtor, when converting collateral, did so with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion. This subjective test focuses on whether the injury was in fact anticipated by the debtor and thus insulates the innocent collateral conversions from non-dischargeability under § 523(a)(6).

Though the standard in these cases may have changed, it remains clear that each case must be determined on its unique facts. *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Endicott*, 254 B.R. 471 (Bankr.D.Idaho 2000).

 IPLA has failed to sustain its burden of proving a willful and malicious injury. Although IPLA's records show a loss on paper of 129 cattle, there was no evidence that the Hammitts sold these cattle and retained the use of the proceeds. All of the proceeds from the sale of IPLA cattle went to IPLA. The Hammitts did

not sell, transfer, or destroy cattle with the specific intent of depriving IPLA of its collateral.

For the foregoing reasons, the objections to discharge under 11 U.S.C. § 727 are denied, and the exceptions to discharge under 11 U.S.C. § 523 are denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

## ORDER

For the reasons set forth in an Opinion entered this day,

IT IS HEREBY ORDERED that Interstate Producers Livestock Association's objections to the discharge of Randy L. Hammitt pursuant to 11 U.S.C. §§ 727(a)(2), (3), and (5) be and are hereby denied.

IT IS FURTHER ORDERED that Interstate Producers Livestock Association's exceptions to discharge under 11 U.S.C. §§ 523(a)(2) and (6) be and are hereby denied.

## ORDER

For the reasons set forth in an Opinion entered this day,

IT IS HEREBY ORDERED that Interstate Producers Livestock Association's objections to the discharge of Patricia Lynn Hammitt pursuant to 11 U.S.C. §§ 727(a)(3) and (5) be and are hereby denied.

IT IS FURTHER ORDERED that Interstate Producers Livestock Association's exceptions to discharge under 11 U.S.C.

§§ 523(a)(2) and (6) be and are hereby denied.