IN RE: Alfonza MCKEEVER, Debtor.

Guy G. Gebhardt, Acting United States Trustee, Plaintiff,

v.

Alfonza McKeever, Jr., Defendant.

Cathy L. Scarver, as Chapter 7 Trustee, Plaintiff,

v.

Robert Ellis, McKeever Paint & Body, Inc., the Viaduct Group, Inc., and Alfonza McKeever, Jr., Defendants.

CASE NO. 10–92243–WLH
ADV. NO. 13–5417, ADV. NO. 15–5336

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Signed May 23, 2016

Thomas Wayne Dworschak, Lindsay P. S. Kolba Office of the U.S. Trustee, Atlanta, GA, for Plaintiff.

Alfonza McKeever, Jr., pro se.

*ORDER DENYING DEBTOR A DIS-
CHARGE AND DENYING TRUS-
TEE'S RECOVERY UNDER SEC-
TION 362*

Wendy L. Hagenau, U.S. Bankruptcy
Court Judge

After almost six years, this matter is before the Court to determine whether the Debtor is entitled to a discharge under 11 U.S.C. § 727 and whether the Debtor violated the automatic stay and is liable to the Trustee in certain amounts. This Court has jurisdiction of this case under 28 U.S.C. §§ 157 and 1334, and the case is a core matter under 28 U.S.C. § 157(b)(2)(J) and (G).

## PROCEDURAL HISTORY

This case has a tortured procedural history. The Debtor, Alfonza McKeever ("McKeever" or "Debtor"), initially filed a petition under Chapter 13 of the United States Bankruptcy Code on October 29, 2010, and was represented in the filing by Kenneth Mitchell. During the Chapter 13 case, Cranberry Financial LLC ("Cranberry") filed a motion for relief from stay to foreclose on business property located at 5361 Covington Highway, Decatur, Georgia ("Property"). Cranberry also filed a proof of claim for the debt and security deed on the Property, including attorney fees. The Debtor objected to the claim. Branch Banking & Trust ("BB & T") filed claims on December 8, 2010, in the amounts of $30,844.13 and $479,375.16, which raised the question of whether the Debtor exceeded the debt limits for Chapter 13. This prompted the Debtor to file a motion to convert his case to one under Chapter 11 on May 16, 2011. The motion to convert was granted, and the case was converted to one under Chapter 11 on July 13, 2011. Neither Cranberry's motion for relief nor the Debtor's objection to Cran-

berry's claim was heard in the Chapter 13 case.

When the case was converted to one under Chapter 11, it had already been pending for eight months with no plan confirmed. The Debtor filed a Chapter 11 plan on November 2, 2011 and a disclosure statement the next day and made payments to Cranberry in the interim. Numerous objections were filed to the plan and disclosure statement, and at least one set of amendments was made to each. On March 28, 2012, the United States Trustee ("UST") filed a motion to dismiss the Chapter 11 case on the grounds that it did not appear the Debtor could confirm a Chapter 11 plan. Cranberry urged the Court to convert the case to one under Chapter 7 rather than to dismiss it. On April 24, 2012, Mr. Mitchell moved to withdraw from his representation of the Debtor, but the Debtor opposed his counsel's request. The Court then entered an order on May 10, 2012, allowing the parties to enter into mediation and requested Mr. Mitchell to remain as counsel through the mediation.

The mediation was unsuccessful. The objection to Cranberry's claim was specially set for an evidentiary hearing on January 23, 2013. The claim objection was inexplicably withdrawn by Mr. Mitchell on January 18, 2013. The Court then held a status conference on January 23, 2013, where it became clear to the Court that the Debtor continued to object to the Cranberry claim, that a potentially valid basis for such an objection existed, and that the relationship between Debtor and counsel had deteriorated to a point that withdrawal was appropriate. The Court therefore permitted Mr. Mitchell to withdraw and appointed a Chapter 11 trustee. The trustee appointed was Cathy Scarver.

The Court held an initial status conference with the Trustee, the Debtor and

other parties in interest on February 21, 2013. The Trustee filed her first status report on March 23, 2013, raising as one of the issues whether there was proper insurance on the Property and, in particular, whether the Trustee was named as an additional insured. The Trustee's status report also notified the Court of an accident that occurred at the Property and which forms the basis of the issues discussed in detail below. The Court held an expedited status conference on April 4, 2013 regarding the Trustee's status report, including proof of insurance and other topics. At this hearing, the Court verified that the Debtor had obtained new insurance, which was in his personal name, and that the Trustee was identified as an additional insured. The Debtor disclosed he had made a claim for the damage to the Property and was in discussion with the insurance company and adjuster about it. The Court directed the Debtor to share with Ms. Scarver whatever claim had already been filed on the Property and any responses. The Court set another status conference for April 25, 2013.

The day before the next status conference, Cranberry filed a motion to prohibit the use of cash collateral, alleging that an insurance check had been issued for the damage to the Property and wanting to ensure that it was not used without Cranberry's permission or the Court's authority. Nevertheless, at the hearing held on April 25, 2013, the Court learned that the check at issue, which had been made payable jointly to McKeever Paint & Body ("MP & B") and Cranberry, had been negotiated even though Cranberry's counsel represented that Cranberry had not endorsed the check. In response, the Court converted the case to one under Chapter 7.

Ms. Scarver remained the trustee in the Chapter 7 case. Shortly after the conversion, on May 6, 2013, an attorney, David Miller, appeared on behalf of the Debtor. Nevertheless, Mr. Miller withdrew a year later, on May 15, 2014, alleging the Debtor did not follow his advice. The Debtor has remained unrepresented since May 15, 2014. During the Chapter 7 case, the Trustee objected to the claim of Cranberry. On the eve of trial, the Trustee and Cranberry reached a settlement and filed a motion to compromise on December 12, 2013. The proposed settlement awarded Cranberry an allowed secured claim of $85,000 rather than the $129,000 plus that Cranberry claimed was due at the time. After an evidentiary hearing on the merits of the compromise, the Court approved the compromise over the Debtor's objection on February 25, 2014. In the meantime, the UST filed the above-styled action against Mr. McKeever on November 26, 2013, objecting to his discharge. Thereafter, on August 27, 2015, Ms. Scarver, as the Chapter 7 Trustee, filed her complaint against the Debtor and multiple other parties related to the disposition of the insurance check and other matters.

The Court set down for trial the UST's adversary proceeding objecting to discharge under Section 727 and only Count VII of the Chapter 7 Trustee's complaint. The trial was held over four days between November 2015 and March 2016. The Debtor represented himself, Tom Dworschak represented the UST, and Russell Patterson represented the Chapter 7 Trustee.

After review of the evidence, including documents and testimony, and the entire record of this case, the Court makes the following findings of fact.

## FINDINGS OF FACT

*Loan*

Mr. McKeever and his "family", which he described as up to twenty-three differ-

ent people, operated a body shop business which they named MP & B. In 1995, Mr. McKeever purchased the Property and moved the body shop business there. Mr. McKeever purchased the Property in his individual name with a loan he obtained from NationsBank of Georgia, N.A. dated January 30, 1995 in the original principal amount of $170,000. The note was executed by Mr. McKeever personally. The note is secured by a deed to secure debt and an assignment of leases and rents, both from Mr. McKeever individually to Nations-Bank, and both dated January 30, 1995. MP & B executed a guaranty of Mr. McKeever's note, with Mr. McKeever signing the guaranty on behalf of MP & B. MP & B's guaranty was secured by a Security Agreement also dated January 30, 1995, granting NationsBank a security interest in its personal property, including furniture, fixtures, equipment, inventory and accounts receivable. Mr. McKeever signed the Security Agreement as president of MP & B.

*MP & B and Viaduct*

MP & B was a corporation in existence in 1995. The body shop operated on the Property and expansions and improvements were made to the Property. Mr. McKeever was the principal operator of the business. In 1998, Mr. McKeever was seriously injured, was in a coma and was incapacitated for a prolonged period of time. The corporate registration of MP & B lapsed and MP & B was administratively dissolved on July 4, 1998. Due to his injury, Mr. McKeever could no longer operate MP & B or its business and it conducted no further business. Sometime thereafter, Mr. McKeever's aunt, Delores Ellis, together with her husband Robert Ellis, began operating The Viaduct Group ("Viaduct"), which conducted a paint and body shop business on the Property just as MP & B had done. Ms. Ellis also operated a collision center at the Property called

Impact Solutions. Mr. McKeever testified that MP & B effectively became a sublandlord. Mr. McKeever testified there were a number of leases with Viaduct. However, only one lease is of record, and that is a lease attached to MP & B's proof of claim 11–1. This commercial lease is dated July 27, 2009 and is between Mr. McKeever individually as the landlord and "The Viaduct Group (Delores Ellis)" as the tenant. The lease is for a period of 10 years. There is no evidence of any leases between "The Viaduct Group (Delores Ellis)" and MP & B, or between Mr. McKeever and MP & B, or between Impact Solutions and anyone. Relevant to this matter, the lease between Viaduct and Mr. McKeever required Mr. McKeever as landlord to carry fire and casualty insurance on the Property. Viaduct, as the tenant, was to carry insurance on equipment and fixtures. The parties handwrote into the lease, "Landlord agrees to cover Dwelling only of the Building. Tenant is responsible for Tenant Personal Property."

As of the petition date, MP & B was dissolved, was conducting no business, and had not filed tax returns in a number of years. Mr. McKeever continued to use MP & B as a trade name though. Mr. McKeever's Schedule B shows that MP & B is 100% owned by him and has a value of $415,000 (the alleged value of the Property). Mr. McKeever's Statement of Financial Affairs shows that Viaduct provided a portion of the Debtor's income from 2008 through the petition date. Mr. McKeever's Statement of Financial Affairs also states that he is an officer, director, self-employee or sole proprietor of Viaduct, which is in the auto repair business at the Property and has been since at least 2004.

*Insurance*

At the time the Trustee was appointed in the Chapter 11 case in January 2013,

the insurance on the Property was issued by Lloyd's of London. The policy was in the name of "McKiver Paint & Body, Inc." and had an effective date of December 8, 2012 through December 8, 2013. The property of "McKiver Paint & Body, Inc." was identified as the Property, 5361 Covington Highway. Capitol Crossing Bank/Capital Crossing Servicing LLC (the prior holder of the NationsBank note) was identified as the mortgagee/loss payee. The insurance policy provided property coverage of $200,000 and liability coverage of $1,000,000. Payments on the policy were made by Mr. McKeever from Viaduct's lease payments to Mr. McKeever or by Viaduct directly. By early 2013, Mr. McKeever had received notice from his insurance agent stating that Lloyd's of London was cancelling the insurance policy on the Property due to various repairs that were needed. This was reported to the Court at the February 21, 2013, status conference. Despite repairs being made by Mr. McKeever and his family, Lloyd's ultimately sent notice that the policy would be cancelled effective April 5, 2013. In anticipation of the Lloyd's cancellation, Mr. McKeever bought a policy through Scottsdale Insurance Company to cover the Property. This policy was effective March 15, 2013, and was purchased in Mr. McKeever's name personally.

*Accident and Insurance Check*

The specific issue in this case arises from an accident occurring on March 2, 2013. Mr. McKeever testified that, while moving a car, he accidentally hit a load-bearing post at the Property, causing a loft office on the second floor to collapse, as well as other damage to the building. Mr. McKeever made a claim against the Lloyd's insurance policy. After the claim report, an adjuster inspected the Property on March 6, 2013 and prepared an estimate of damages. On April 10, 2013, Mr. McKeever signed a proof of loss, claiming

damages of $40,185.61. On April 11, 2013, a check was issued by the insurance company to MP & B and Cranberry Financial LLC ISAOA ATMA C/O Capital Crossing File and Records in the amount of $40,185.61. The damages claimed and amount paid did not include any damages for personal property because the insurance company took the position personal property was not covered by the policy.

Mr. McKeever personally received the check from Lloyd's. Mr. McKeever called Cranberry and asked it to endorse the check. Cranberry asked Mr. McKeever to endorse the check and send it to Cranberry. Cranberry claimed entitlement to the insurance proceeds but Mr. McKeever was still disputing the amount of Cranberry's claim at that time and declined to send the check to Cranberry. During this same time period, Mr. McKeever called the Trustee and asked her to have Cranberry sign the check. The Court finds the Trustee asked Mr. McKeever to deliver the check to the Trustee. While Mr. McKeever disputes this fact, the Court finds the Trustee's testimony to be more believable, as Mr. McKeever simultaneously took the position that the Trustee lacked any interest in the check because it was not payable to the Debtor.

Rather than deliver the check to Cranberry or to the Trustee, Mr. McKeever took the check to Athens, Georgia, to his mother's house where various family members were gathered. He left the check at his mother's house. Several days later, he returned to her house and the back of the check contained a Cranberry endorsement. The Cranberry endorsement is not handwritten in any respect and appears to have either been typed or placed by a stamp. Mr. McKeever then endorsed the check on behalf of MP & B.

Mr. McKeever realized that, because the check was made payable to MP & B, it needed to be deposited into a MP & B account, and that MP & B needed to be properly incorporated to open an account. On April 17, 2013, Mr. McKeever incorporated MP & B again in the State of Georgia. Mr. McKeever used the same tax identification number for the new MP & B as he had used for the original MP & B. Mr. McKeever signed the papers submitted to the Secretary of State as the authorized person on behalf of MP & B and also signed the articles of incorporation. On the same day, Mr. McKeever went to Wells Fargo and opened a MP & B bank account because MP & B had not had a bank account since 1998. Mr. McKeever submitted to the bank the articles of incorporation and the proof of incorporation from the State of Georgia. All of the documents for the establishment of the MP & B bank account were signed by Mr. McKeever as the authorized signer or as the owner. Once the account was opened, Mr. McKeever deposited the check into the MP & B bank account on April 18, 2013. The very next day, on April 19, Mr. McKeever withdrew $39,000 in cash from the MP & B bank account. By April 30, 2013, there was only $460.23 remaining in the account.

*Bankruptcy Court Hearings*

While the Debtor was negotiating with Lloyd's over the insurance check, and then negotiating the check, the Court was holding conferences on the issue. On April 4, 2013, the Court held a status conference where the topic of insurance and the accident were discussed at length. (The Lloyd's insurance was scheduled to terminate the next day.) Mr. McKeever did not volunteer at the hearing that the adjuster had already inspected the Property and prepared an estimate of damages. Instead, when asked, Mr. McKeever stated he was working on the claim with the insurance adjuster. At the hearing, the Trustee stated repeatedly she wanted to make sure a claim was made for the damage to the Property and that the claim was going to be paid. Mr. McKeever stated that MP & B had made a claim. Mr. McKeever stated that MP & B carried the only policy covering the building at the time. At the hearing, the following exchange occurred between the Court and Mr. McKeever:

> The Court: What I need you to do is to share with Ms. Scarver whatever claim has already been filed . . . on the property so that she can see what the claim is that's been filed and if there have been any responses back.
>
> . . .
>
> Mr. McKeever: But see the problem is I'm having with my aunt dealing with an attorney with that is it's McKeever Paint and Body which says the courts don't have anything pretty much to do with McKeever Paint and Body, they deal with me.
>
> . . .
>
> The Court: So here's why, here's why you personally and therefore your trustee [are] interested in this . . . is that the building is the collateral for Cranberry . . . and that's the building you own personally . . . and the loan you owe personally. And if there's damage to their collateral, then that's a problem, and we all need to be satisfied that the damage is being repaired from whatever source. So even though I understand that it's McKeever Paint and Body . . . that's making the claim . . . and that had the insurance, and I can understand why it would have been their insurance since they were the business operating there, the bottom line is that the damage that occurred, occurred to

your personal property and as the landlord you need to be comfortable, and Ms. Scarver needs to be comfortable, and as the lender Ms. Waites needs to comfortable, that money is coming to repair that damage and that there you know that there is a real estimate for the cost of repair, and real money comes from some source to fix it. . . . So what can you do before April 25th to inform everybody about the status of that?

Mr. McKeever tried to distinguish any interest the Debtor may have in the building by stating that the damage occurred not to "the building per se itself, it's the office overhead, office that was built by my aunt and which was their office and it came tumbling down, so it's not anything jeopardizing the value of the, you know, value of the building, . . .". The Court explained,

> On the other hand, if Cranberry ever foreclosed on that, they would get the office on top as well as what's underneath. . . . So it's all part of the same building, and you can't separate it out that way. . . . So let's just be sure we're on the same page. You need to give Ms. Scarver a copy of the claim that's been made and a copy of the responses from the insurance company . . . And you need to go get an estimate of what that costs. If the insurance company hasn't already come out and inspected it and told you what it's going to cost to . . . repair it, you need to go get one, because on the 25th I want to see all those three things.

Six days later, Mr. McKeever signed a proof of loss for $40,185.61. Mr. McKeever states he informed Ms. Scarver generally of the status of the situation, and Ms. Scarver denies that Mr. McKeever provided her with a copy of the claim and the adjuster's report and the response. It is undisputed, however, that Mr. McKeever did inform Ms. Scarver he received the check when he called her and asked for her assistance in getting Cranberry to sign it. No one brought the issuance of the check to the Court's attention until Cranberry filed a motion to prohibit the use of cash collateral. By that time, however, the Debtor had cashed the check on behalf of MP & B.

The Court held its next regularly scheduled status conference on April 25, 2013. At the status conference, Ms. Scarver stated that about a week and a half prior, Mr. McKeever called her to report he had received the check. Mr. McKeever declined to provide Ms. Scarver with the amount of the check. At the hearing, Mr. McKeever stressed the importance of having the funds from the check immediately because there was no power at the Property. Mr. McKeever stated he called Cranberry to obtain its signature and also called Ms. Kelly Waits, Cranberry's counsel, to obtain its signature. He stated again he told Ms. Scarver about the check and asked for her assistance. At the hearing, the Court asked Mr. McKeever if he had signed Cranberry's name, and he denied it. The Court stated as follows:

> The Court: Somebody signed a name that was not their own.
>
> Mr. McKeever: Yes.
>
> The Court: And you understand that that can be a crime?
>
> Mr. McKeever: That can be a crime, and they got together and say, you know, that when that situation happens, if Cranberry just decides to pursue McKeever Paint and Body, then
> . . .
> . . .
> The Court: I don't know who signed that check, but that $40,000 better be in Ms. Scarver's account in 48 hours on Monday morning.

Mr. McKeever: Well, it's already gone, Your Honor.

The Court: Then we're going to have to report it to the federal authorities as a bankruptcy crime.

The Court then promptly converted the case to one under Chapter 7.

*Repairs*

The Debtor's defense in April 2013, as well as at the trial of this matter, is that the funds that were the proceeds of the check were used to make repairs to the Property. It is the Debtor's view that, because he used the insurance proceeds to repair the Property, neither Cranberry nor the estate was harmed. In support of the Debtor's position that he used the funds for repairs, the Debtor called Dewan Rogers, who was the electrician that performed much of the work. The Debtor also introduced three supporting exhibits. One showed that electrical work began on April 19, 2013, and was completed on April 30, 2013, for a total of $5,935, which was paid upon completion. The exhibits showed that Mr. Rogers then began another portion of the electrical work on May 1, 2013, completing it on May 7, 2013, for $6,325. Finally, the third portion of Mr. Rogers' work was begun on May 8, 2013, and completed on May 15, 2013, for a total of $5,425. The Debtor also submitted an invoice from Thomas Roofing & Contracting showing that work began on April 20, 2013, and the estimated finish date was May 22, 2013. The Debtor paid $7,000 down on April 20, 2013, and the balance of $15,756 was due on May 22, 2013. The contracted-for work included repairs to beams, floors, roof, garage doors, and carpet. The Debtor further reviewed for the Court the work that was to be performed pursuant to the insurance adjuster's report and testified that he had completed all of the necessary work, including repairing the steel beams, framing, heat and ventilation system, and structural problems and repainting the damaged area. The Debtor testified the total cost of repair which he and his family bore exceeded the insurance proceeds. Finally, the Debtor testified that he and his family continued to make improvements to the Property throughout 2015, including repairing the roof, replacing asphalt and repairing a driveway.

*Debtor's Family*

To understand the Debtor's position, it is important for the Court to make note of the Debtor's relationship with his family. The Debtor stated in his schedules that he was the 100% owner of MP & B, but now he takes the position that his "family" owns it. The Debtor did not identify all of the family members that have an ownership interest in MP & B, but did identify his mother, his aunt Delores Ellis, and his uncle Robert Ellis as at least part owners in MB & P with him. Robert Ellis and Delores Ellis are also at least part owner of Viaduct, and Delores Ellis is at least part owner of Impact Solutions. The Debtor describes his various businesses as "family businesses". While he is the point-person and the person to whom authority is given to operate the businesses, he insists he is not the sole owner or beneficiary of the businesses he runs.

In the history of this case, with the numerous hearings the Court has held, it is clear to the Court that the Debtor and his family operate on a basis that is somewhat different from what the Bankruptcy Code would expect of a debtor. When the Debtor was severely injured in 1998, his family took care of him and his properties and business, and he views his responsibility to be to his family, in large part because of the efforts they made to take care of him. His family relies on the operations of the body shop at the Property for their income. While the Debtor was in the Chapter 11 case, the parties and the Court

could never pin down the Debtor's income because the Debtor's position consistently was that, whatever was needed, the family would make available to him to pay creditors. This was largely true, as the Debtor did make all of the mortgage payments on his house post-petition and virtually all of the mortgage payments to Cranberry until the case was converted to one under Chapter 7. It is also clear to the Court, and has been throughout the six years of this case, that the Debtor and his family operate largely on a cash basis. The Debtor did not regularly use a personal checking account and MB & P did not have a checking account, although Viaduct did. A review of all bank accounts presented to the Court shows large withdrawals of cash. The Debtor testified that the body shop work was done largely on a cash basis or barter basis. The testimony from Mr. Rogers and the Debtor was that the payment for repairs was made in cash. This makes ascertaining the use of the funds challenging.

*Complaints*

Based on the foregoing, the UST filed a Complaint Objecting to Debtor's Discharge on November 26, 2013. The UST alleges the Debtor's discharge should be denied pursuant to 11 U.S.C. §§ 727(a)(2)(B), (a)(3), (a)(4)(D) and (a)(5). Later, on August 27, 2015, Cathy Scarver, as the Trustee for this case, filed an adversary proceeding against the Debtor, Robert Ellis, MP & B, and Viaduct, seeking in part damages arising from the negotiated insurance check. Count VII of the Trustee's Complaint specifically alleges that the Debtor violated the automatic stay by his retention and use of the check and the proceeds thereof. The Trustee alleges she has been damaged by the Debtor's willful violation of the stay and is entitled to damages under 11 U.S.C. § 362(k)(1).

## LAW

The UST argues the Debtor is not entitled to a discharge pursuant to 11 U.S.C. §§ 727(a)(2)(B), (a)(3), (a)(4)(D) and (a)(5). Although not pled in the UST's Complaint, the UST also alleges the Debtor's discharge should be denied pursuant to Section 727(a)(6)(A). Because one of the fundamental goals of the Bankruptcy Code is to provide a debtor with a fresh start, "[a] denial of a discharge is an extraordinary remedy and therefore, statutory exceptions to discharge must be construed liberally in favor of the debtor and strictly against the objecting party." *E. Diversified Distribs., Inc. v. Matus (In re Matus)*, 303 B.R. 660, 671 (Bankr.N.D.Ga. 2004) (citations omitted). "The reasons for denying a discharge ... must be real and substantial, not merely technical and conjectural." *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir.1994) (citations omitted). The burden of proving the objection to discharge is on the plaintiff, Fed. R. Bankr.P. 4005, and the burden must be carried by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

*Section 727(a)(2)(B)*

Section 727 of the Bankruptcy Code provides, in pertinent part

(a) The court shall grant the debtor a discharge unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

. . .

(B) property of the estate, after the date of the filing of the petition....

■ 11 U.S.C. § 727(a)(2)(B). Thus, to deny a debtor a discharge under this section, a plaintiff must show the debtor transferred estate property, within the requisite time period, and had the requisite intent to hinder, delay, or defraud. "Section 727(a)(2) is intended to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets." *6 Collier on Bankruptcy* ¶ 727.02[1] (Alan N. Resnik & Henry J. Sommer eds., 16th ed. Supp. 2013). Harm or injury to a creditor or the estate is not required under Section 727(a)(2). *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1200 (9th Cir.2010) (quoting *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281–82 (9th Cir.1996)); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir.2000); *In re Snyder*, 152 F.3d 596, 601 (7th Cir.1998) (quoting *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 569 (7th Cir.1989)).

While "transfer" is not defined in Section 727, 11 U.S.C. § 101(54) defines transfer to mean,

(A) the creation of a lien;

(B) the retention of title as a security interest;

(C) the foreclosure of a debtor's equity of redemption; or

(D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—

(i) property; or

(ii) an interest in property.

■ Under this broad definition of transfer, even a disposition of possession, custody, or control could qualify as a transfer. Removal, on the other hand, is "an actual or physical change in the position or locality of property of the debtor resulting in a depletion of the debtor's estate." *6 Collier on Bankruptcy* ¶ 727.02[6][a] (16th ed.). Concealment includes physical hiding of

the property, and "other conduct, such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failing or refusing to divulge owed information." *Id.* at ¶ 727.02[6][b]; *see also San Jose v. McWilliams*, 284 F.3d 785, 794 (7th Cir.2002); *Keeney*, 227 F.3d at 684; *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 n. 1 (10th Cir.1997). The deposit of a check constitutes a "transfer" under Section 727(a)(2). *See Cain v. Shingledecker (In re Shingledecker)*, 242 B.R. 80, 83 (Bankr.S.D.Fla. 1999) ("Not only does ample case law construe a check deposit as a transfer for § 727(a)(2) purposes, the statutory definition of the term 'transfer' under § 101(54) of the Bankruptcy Code is sufficiently broad to include a check deposit as a form of transfer.").

■ The second requirement for denying a discharge under Section 727(a)(2) is that the property which is transferred, concealed, or removed be property of the debtor or property of the estate. "[S]ection 727(a)(2)(A) does not apply when the disposition involves property belonging to someone, or some entity, other than the debtor, even if the transfer may cause an incidental effect upon the debtor's assets." *Wachovia Bank. N.A. v. Spitko (In re Spitko)*. 357 B.R. 272, 299 (Bankr.E.D.Pa. 2006). The debtor "must have more than a mere *derivative interest* in the property ... [it must have] a *direct* proprietary interest." *Ne. Neb. Econ. Dev. Dist. v. Wagner (In re Wagner)*, 305 B.R. 472, 475 (8th Cir. BAP 2004) (emphasis in original) (citations omitted). The third requirement is that the transfer must have been made by the debtor, as opposed to by another person or entity. *Id.*; *see also Riumbau v. Colodner (In re Colodner)*, 147 B.R. 90, 93 (Bankr.S.D.N.Y.1992) ("The key factor with respect to an allegation ... under subsection (2)(B), is that *the debtor* must

have engaged in the prescribed conduct . . . ." (emphasis in original).

■■■ Finally, a party proceeding under Section 727(a)(2) must prove the debtor possessed an actual intent to hinder, delay, or defraud creditors or the trustee when he transferred, concealed or removed his or the estate's property. The Eleventh Circuit has made clear that a preferential transfer is not the type of transfer which will bar a discharge. *In re Miller*, 39 F.3d at 307; *see also Hultman v. Tevis*, 82 F.2d 940, 941 (9th Cir.1936); *Rutter v. Gen. Motors Acceptance Corp.*, 70 F.2d 479 (10th Cir.1934); *Ins. Office of Am., Inc. v. Wall (In re Wall)*, 2008 WL 8792259 (Bankr.S.D.Ga. Mar. 31, 2008). Constructive fraud is also insufficient. *In re Miller*, 39 F.3d at 306. Actual intent, however, may be inferred from the circumstances surrounding the transfer or concealment. *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir.1992). The actions at issue should demonstrate "culpable intent", such that the actions are "blameworthy in an equitable sense." *Belmont Wine Exch., LLC v. Nascarella (In re Nascarella)*, 492 B.R. 914, 916 (Bankr.M.D.Fla.2013) (citations omitted). A debtor's belief that a transfer was morally justified is irrelevant if the requisite intent is established. *See Haag v. Nw. Bank (In re Haag)*, No. 10–01207–EWH, 2012 WL 4465353, at *6 (9th Cir. BAP Sept. 27, 2012).

The question before the Court is whether the insurance check and/or its proceeds are property of the estate and whether the Debtor transferred or removed or permitted to be transferred or removed those funds with intent to hinder or delay or defraud Cranberry or the Trustee.

*Property of the Estate*

Under 11 U.S.C. § 541(a)(1), property of a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Because this proceeding involves property acquired post-petition while the Debtor was in an individual Chapter 11 case, property of the estate also includes "all property of the kind specified in section 541 that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted." 11 U.S.C. § 1115(a)(1).

■■■ In general, unless a federal interest requires a different result, state law governs the determination of what legal or equitable interests a debtor holds in property. *Traveler's Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450–51, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007) (citing *Butner v. U.S.*, 440 U.S. 48, 54, 55, 57, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). However, "whether a debtor's interest constitutes 'property of the estate' is a federal question." *Charles R. Hall Motors, Inc. v. Lewis (In re Lewis)*, 137 F.3d 1280, 1283 (11th Cir.1998) (citations omitted); *see also Southtrust Bank of Ala., N.A. v. Thomas (In re Thomas)*, 883 F.2d 991, 995 (11th Cir.1989) ("Property rights under section 541 are defined by state law. However, once that determination is made, federal bankruptcy law dictates to what extent that interest is property of the estate.").

■■■ The Debtor contends the insurance check and its proceeds are not property of the Debtor's estate, but instead are property of MP & B. He contends that, because MP & B is separate from him personally, the disposition of the funds is not governed by the Bankruptcy Code. The Debtor is correct that "[a] basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets . . ." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–

75, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) (citations omitted). This basic tenet of American corporate law holds true in Georgia. *Shelby Ins. Co. v. Ford*, 265 Ga. 232, 233, 454 S.E.2d 464 (1995). This is so "even in the situation in which a corporation is owned solely by one person." *Dep't of Transp. v. McMeans*, 294 Ga. 436, 437, 754 S.E.2d 61 (2014). The bankruptcy estate of a corporation's shareholder, therefore, will not typically include corporate assets. *In re Young*, 409 B.R. 508, 513 (Bankr.D.Idaho 2009) ("It is well accepted that a filing by an individual who is an owner of a corporation brings into the estate only his ownership interest and not the assets of the corporation"). As a result, a debtor's transfer of corporate assets generally cannot result in denial of discharge under Section 727(a)(2). *See Mover v. Geer (In re Geer)*, 522 B.R. 365, 391–92 (Bankr.N.D.Ga.2014) (quoting *Spitko*, 357 B.R. at 299).

While a corporation's assets are not typically assets of its owner or owners, here MP & B had been administratively dissolved for over twelve years at the time the petition was filed and almost fifteen years at the time of the issuance of the insurance check. "A corporation administratively dissolved continues its corporate existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs under Code Section 14–2–1405." O.C.G.A. § 14–2–1421(c). An administratively dissolved corporation may apply for reinstatement, but only for a period of five years. O.C.G.A. § 14–2–1422(a). The law in Georgia is clear that after the reinstate-ment period ends, an administratively dissolved corporation ceases to exist. *Gas Pump, Inc. v. Gen. Cinema Beverages of N. Fla., Inc.*, 263 Ga. 583, 584, 436 S.E.2d 207 (1993). "The expiration of the time for reinstatement puts a stamp of finality on the demise of the corporation—it can no longer be resuscitated. The unavoidable conclusion is that the corporation cannot, after the time its demise is deemed complete, initiate any activity. To permit a suit to be initiated in the name of the dissolved corporation after that time would be to sanction a form of legal necromancy, reanimation of the empty husk of a dead corporate entity." *Id.*; *see also Deere & Co. v. JPS Dev., Inc.*, 264 Ga.App. 672, 673, 592 S.E.2d 175 (2003); *Fulton Paper Co. v. Reeves*, 212 Ga.App. 314, 317 n. 4, 441 S.E.2d 881(1994).[1]

As a matter of law, therefore, MP & B ceased to exist as a separate entity by July 4, 2003, prior to the filing of this bankruptcy case and prior to the accident giving rise to the claim which led to the insurance check and proceeds. MP & B was not authorized to transact any business after its dissolution, so the insurance claim arising after MP & B was dissolved was not the claim of a corporate entity. This legal conclusion is consistent with the facts established at the trial. MP & B became inactive and eventually dissolved after Mr. McKeever was disabled in 1998. MP & B had no bank accounts until April 2013, when Mr. McKeever opened a bank account in which to deposit the insurance check. MP & B filed no tax returns after its dissolution. After MP & B became inactive, MP & B's business was operated

---

1. On July 4, 1998, the date MP & B was dissolved, O.C.G.A. § 14–2–1422(a) did not include a time period within which an administratively dissolved corporation must apply for reinstatement. *See* 1997 Ga. Laws 1165, 1185–86 (amending § 14–2–1422(a) to remove the five-year reinstatement then in ef-fect). However, the current version of § 14–2–1422(a) includes a five-year reinstatement period, and has since July 1, 2008. *See* 2008 Ga. Laws 253, 259. That five-year limit "shall apply to all corporations administratively dissolved ... regardless of the date of dissolution." O.C.G.A. § 14–2–1422(e).

by Viaduct with Mr. McKeever as Viaduct's landlord. Although Mr. McKeever claims that MP & B eventually became a sub-landlord, the only lease in the record is a ten-year lease between Mr. McKeever and Viaduct dated July 27, 2009. The evidence suggests MP & B did nothing other than be the named insured on the insurance policy covering the Property.

The Debtor's attempt to resuscitate MP & B by incorporating another McKeever Paint & Body, Inc. did not reinstate the dissolved MP & B. The McKeever Paint & Body, Inc. incorporated on April 17, 2013 was a new corporation, with its own Articles of Incorporation and its own certificate of incorporation from the Georgia Secretary of State. The distinction between reinstating MP & B and "reincorporating" a new McKeever Paint & Body, Inc., is not a distinction without a difference. Had the Debtor been able to reinstate MP & B within five years of its dissolution, this could be a very different case. "When the reinstatement is effective, it relates back to and takes effect as of the effective date of the administrative dissolution and the corporation resumes carrying on its business as if the administrative dissolution had never occurred." O.C.G.A. § 14–2–1422(d). Construing the similar Georgia Code provisions for reinstatement of nonprofit corporations, the Georgia Court of Appeals held that reinstatement can retroactively give legal capacity for an act performed before reinstatement (i.e., when the corporation lacked legal capacity). *Williams v. Martin Lakes Condo. Ass'n, Inc.*, 284 Ga.App. 569, 571, 644 S.E.2d 424 (2007). MP & B, however, was not reinstated and the current MP & B is not the same one that dissolved in 1998.

■ Notwithstanding MP & B's legal non-existence after July 2003, and notwithstanding the factual non-existence of business operations and assets after 1998, Mr. McKeever continued to use the name MP & B for the purpose of at least being the named insured on the insurance policy covering the Property. The Court concludes that MP & B was a "doing business as" or trade name of Mr. McKeever. Mr. McKeever testified to that effect at the trial, assuring the Court the local trade name index would show MP & B as a trade name. As a trade name, MP & B was not a separate entity and neither the insurance policy nor the insurance proceeds were acquired by a separate legal entity. Instead, both were acquired by Mr. McKeever in his individual capacity. " 'A policy issued under the trade name of an individual is viewed as if issued under his given name.' Accordingly, a policy that lists a trade name as the 'named insured' also extends coverage to the individual." *Miller v. Harco Nat'l Ins. Co.*, 274 Ga. 387, 391, 552 S.E.2d 848 (2001) (quoting *Simmons v. Ins. Co. of N. Am.*, 17 P.3d 56, 61 (Alaska 2001)). It is established under Georgia law that " '[a]n unincorporated proprietorship is not a legal entity separate from the proprietor, and the use of a trade name for the business does not create a separate legal entity.' Indeed, '[a] trade name ... is merely a name assumed or used by a person recognized as a legal entity' and 'is nothing more than the alter ego of the individual.' " (citations omitted). *Shiho Seki v. Groupon, Inc.*, 333 Ga.App. 319, 324–25, 775 S.E.2d 776 (2015) (quoting *Harco Nat'l Ins. Co.*, 274 Ga. at 391, 552 S.E.2d 848).

■ At the time of the accident forming the basis for the claim under the insurance policy, MP & B did not exist and the Debtor operated under the MP & B name, at most, as a trade name. The Property was owned by the Debtor individually. The Court concludes the insured under the insurance policy was actually Mr. McKeev-

er. This conclusion is consistent with the terms of the lease between Mr. McKeever and Viaduct which required that he carry the insurance on the building while Viaduct would carry any insurance on the personal property. The decision of the insurance company that there was no insurance on the personal property is further evidence that Mr. McKeever fulfilled his personal obligation under the lease of insuring the building and not the personal property. Therefore, the insurance check and proceeds thereof are property of the Debtor's estate.

*Transfer by the Debtor*

There is no doubt that the Debtor transferred or removed or permitted the transfer or removal of the insurance proceeds. As noted, the definition of "transfer" at 11 U.S.C. § 101(54) is broad, and the Debtor's actions in this case easily qualify. The Debtor personally presented the insurance check for deposit at Wells Fargo, personally withdrew the money, and personally, with his family, spent the money on repairs. Such actions constitute a "mode ... of disposing of or parting with ... property." 11 U.S.C. § 101(54)(D)(i). As such, they constitute a transfer for purposes of Section 727(a)(2).

The UST argued the funds were not "gone" as of the April 25, 2013 status conference because repairs were not completed until well after that date. The exact dates of cash payments are not available to the court. Mr. McKeever testified some family funds had been used for repairs before the insurance check was received, so some of the insurance proceeds effectively reimbursed the family. The Debtor told the Court on April 25, 2013, the money was gone. The money was eventually used by the Debtor and his family for repairs, so there is no doubt monies were transferred by the Debtor.

*Intent*

The last element to be established under Section 727(a)(2) is that the Debtor possess an actual intent to hinder, delay, or defraud Cranberry or the Trustee when he transferred or removed the insurance proceeds. Because that language is written in the disjunctive, intent to hinder is sufficient by itself, as is intent to delay. "A debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2). Because the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor". *Retz,* 606 F.3d at 1200. *See also NCNB Tex. Nat'l Bank v. Bowyer (In re Bowyer),* 916 F.2d 1056, 1059 (5th Cir. 1990), *rev'd on reh'g on other grounds,* 932 F.2d 1100 (5th Cir.1991); *Smiley,* 864 F.2d at 568; *Post–Confirmation Comm. for Small Loans. Inc. v. Innovate Loan Servicing Corp.,* No. 1:13–CV–191 (WLS), 2015 WL 5769229, at *11 (M.D.Ga. Sept. 30, 2015).

The Court concludes the Debtor transferred and used the insurance proceeds with actual intent to hinder and delay both Cranberry and the Trustee. The Debtor knew Cranberry refused to endorse the check and the Court concludes Cranberry did not endorse the check. The Debtor knew Cranberry claimed entitlement to the insurance proceeds. The Debtor was repeatedly made aware—by both the Court and Ms. Scarver—the Trustee had an interest in the insurance proceeds by virtue of the Property being estate property. Mr. McKeever made clear in his testimony that he did not provide the check to Cranberry because he did not think he owed them money as he disputed Cranberry's claim and because it was more important to him and his family that the Property be repaired immediately rather than having the proceeds tied up in a dispute in bankruptcy court. Intent is

also established by the fact the Debtor deposited, withdrew, and spent or concealed the proceeds in quick succession and without Cranberry's or the Trustee's knowledge or consent.

The Debtor apparently felt morally justified in his actions given the needs of the moment to repair the property. The Debtor argued that, as a Chapter 11 debtor, he was entitled to use property in the ordinary course of business to make repairs. The Debtor told the Trustee and Cranberry about the existence of the check so they both were aware of its existence. Nevertheless, once the Trustee was appointed, it was the Trustee's duty and authority, not the Debtor's, to operate the Debtor's business, and to be accountable for the Debtor's property. 11 U.S.C. §§ 1106(a)(1), 1108. The Court is certain the Debtor intended to hinder and delay any access by Cranberry or the Trustee to the insurance funds. Any moral justification is not a defense to, nor does it negate, intent to hinder, delay, or defraud. *See Haag*, 2012 WL 4465353, at *6 (citing *6 Collier on Bankruptcy* ¶ 727.02[3][a] ). Moreover, that the Debtor actually used the proceeds to repair the Property is irrelevant. *See Retz*, 606 F.3d at 1200; *Snyder*, 152 F.3d at 601; *Keeney*, 227 F.3d at 685.

The Court finds that the Debtor transferred estate property—the insurance proceeds—with actual intent to hinder and delay both Cranberry and the Trustee. The Court, therefore, concludes the Debtor will be denied a discharge under 11 U.S.C. § 727(a)(2)(B).

*Section 727(a)(3)*

The UST next contends the Debtor's discharge should be denied under Section 727(a)(3) which states that a debtor should not be given a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case." The purpose of Section 727(a)(3) is to " 'give creditors, the trustee and the bankruptcy court complete and accurate information concerning the debtor's affairs and to ensure that dependable information is provided so that the debtor's financial history may be traced.' " *Hylan Debt Fund LLC—Portfolio Series 18 v. Nestor (In re Nestor)*, 546 B.R. 482, 486 (Bankr. N.D.Ga.2016) (quoting *Harrington v. Simmons (In re Simmons)*, 525 B.R. 543, 547 (1st Cir. BAP 2015)). Intent, however, is not an element of a denial of discharge under Section 727(a)(3). *Protos v. Silver (In re Protos)*, 322 Fed.Appx. 930, 935 (11th Cir.2009); *Peach State Bank & Tr. v. Riddle (In re Riddle)*, 14–5174–bem, 2015 WL 1038473 at *4 (Bankr.N.D.Ga. March 2, 2015).

The UST alleges the Debtor's failure to volunteer and fully disclose information regarding the insurance check would justify denial of discharge under this section. It is undisputed the Debtor did not give the check to the Trustee or provide her a copy of it, but it is also undisputed that she was notified when the check was received. Given that the Court has already ruled the Debtor's discharge will be denied under Section 727(a)(2), the Court will not reach the UST's contention that the Debtor's discharge should also be denied under Section 727(a)(3).

*Section 727(a)(4)(D)*

The Court may also deny the Debtor a discharge if the debtor "knowingly and fraudulently, in or in connection with the case ... withheld from an officer of the estate entitled to possession under this

title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs." The UST argues the insurance check is a record and the Debtor's failure to turn it over provides grounds for denial of discharge under Section 727(a)(4)(D). Alternatively, the UST argues the Debtor's failure to provide certain information pursuant to the Court's order of April 25, 2013 converting the case to one under Chapter 7 provides a basis to deny the Debtor's discharge. Since the Court has already ruled the Debtor is not entitled to a discharge under Section 727(a)(2), the Court will not reach this contention of the UST.

*Section 727(a)(5)*

Next, the UST contends the Debtor's discharge should be denied because he "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liability." Particularly, the UST contends the Debtor's explanation of the use of the insurance proceeds is insufficient. The UST contends at least some portion of the insurance proceeds was used to make repairs to the Property other than repairs necessitated by the insurance loss. The Debtor presented evidence of repairs paid for in excess of the amount of the insurance check. While the Debtor did not establish that the specific dollar received from the insurance company went to the contractors performing the repairs resulting from the insurance loss, the Court finds the Debtor has satisfactorily explained the use of the $40,000 since the cost of repairs performed by the Debtor occasioned by the insurance loss exceeded the amount of insurance proceeds.

*Section 727(a)(6)*

The UST did not plead Section 727(a)(6) as a basis for denial of discharge but argued it in both his opening and closing statements. The UST argued this Court's directions given at the April 4 and April 25, 2013 status conferences regarding the insurance check were violated by the Debtor and the Debtor therefore had refused "to obey any lawful order of the court." Upon review of the Court's direction given at each of the hearings, the Court concludes its directions stopped short of an order clear enough for the Court to find that the Debtor willfully refused to obey the order.

The direction given to the Debtor at the April 4, 2013 status conference required him to keep Ms. Scarver informed. In retrospect, that direction was not specific enough for an individual unrepresented debtor. The Debtor did inform Ms. Scarver of his receipt of the check. The Court notes neither Ms. Scarver nor Cranberry made any efforts to obtain Court direction or protection regarding the use of the check once they learned it had been issued. The Court (wrongly) presumed the Debtor would act as any bankruptcy counsel would and know he was not to use the money without Court authority. Given the Debtor's lack of experience, the Court cannot conclude its direction was raised to the level of an order.

At the April 25, 2013 status conference, upon learning that the insurance check had been cashed, the Court directed the Debtor to return the funds to Ms. Scarver within forty-eight hours. The Debtor stated at that time he could not do so because the money was gone. The Court then stated that the matter would be referred for criminal investigation. This sequence of events did not leave the Debtor with a clear order that he was to gather as much money as he could or obtain money from other sources. The Debtor understood from the Court's statements that there

may be a federal criminal investigation and he expressed his preparedness for that investigation. The Court cannot say it left the Debtor with an express order, as opposed to a statement that the Court would refer the matter for a criminal investigation.

Finally, the UST argues the Debtor failed to comply with the order converting the case. While this order is clear, the evidence did not establish any specific areas where the Debtor willfully failed to obey the order. There is no doubt the Debtor and the Trustee had an ongoing dispute about the Trustee's role in the case. The Court also notes the Trustee was the trustee in the individual Chapter 11 case and therefore some of the items required in the form conversion order were not as necessary since the Chapter 7 Trustee was aware of the operations in the Chapter 11 at least over a several month period of time. Given the nature of the order and the ongoing matters in the case, the Court declines to deny a discharge based on Section 727(a)(6).

### VIOLATION OF THE AUTOMATIC STAY

Count VII of the Trustee's Complaint, which is the only count of the Trustee's Complaint at issue in the trial, alleges the Debtor violated the automatic stay by disposing of the proceeds of the insurance check. The Trustee alleges, and the Court has agreed above, the Debtor had a personal interest in the insurance check and that check was property of the estate.

It is certainly possible for a debtor to violate his own automatic stay by disposing of property of the estate. The more controversial question, however, is whether a trustee has standing under 11 U.S.C. § 362(k)(1) to recover damages (actual or punitive) for the stay violation. Section 362(k)(1) provides, "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." Several courts in the Northern District of Georgia have had occasion to address this question, and each has found the trustee is not an individual entitled to recover damages under Section 362(k). The Court in *Gordon v. Taylor (In re Taylor)*, 430 B.R. 305 (Bankr.N.D.Ga.2010) stated, "In addition to [t]rustee's lack of injury, recovery under [former] section 362(h) is limited to individuals. The Bankruptcy Code does not define individual. '[W]hile a trustee can be an 'individual' if the trustee is a natural person (as opposed to, e.g., a corporate entity), the individual status as trustee precludes any finding that the trustee suffered any damages as an individual, because any harm suffered in the form of costs and attorney's fees is actually incurred by a thing, viz. the bankruptcy estate, and not by the trustee as a natural person.'" *Id.* at 315 (second alteration in original) (quoting *Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 192 (9th Cir.1995); *see also Gordon v. Olufelo (In re Olufelo)*, No. 04–6481–REB, 2009 WL 6498509, at *3 (Bankr.N.D.Ga. May 22, 2009) ("Wilshire argues further, however, that whatever the facts, the trustee lacks standing to recover damages under Section 362(k) because he is not a 'natural person.' This court agrees with those cases reasoning that a trustee is a natural person, though the bankruptcy estate he or she represents may not be") (cites omitted). *Contra, Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods)*, 186 B.R. 414, 439 (N.D.Ill.1995) (trustee is an "individual" for purposes of Section 362(h) (now recodified at Section 362(k)(1))); *Moser v. Mullican (In re Mullican)*, 417 B.R. 389, 403–04 (Bankr.E.D.Tex.2008) ("trustee in this case is an individual representing the

estate of individual, consumer debtors and has standing to bring an action against the debtors for a willful violation of the automatic stay."); *Phillips v. Lehman Bros. Holdings, Inc. (In re Fas Mart Convenience Stores)*, 318 B.R. 370, 375 (Bankr. E.D.Va.2004) (authorizing Chapter 11 trustee to pursue Section 362(h) damages on behalf of estate).

Some courts have taken another step and held that, even if the trustee is not an individual for purposes of Section 362(k), the court may use Section 105 as a remedy for a trustee to pursue a stay violation. *See, e.g., Henkel v. Lickman (In re Lickman)*, 297 B.R. 162, 195 (Bankr.M.D.Fla. 2003); *see also Olufelo*, 2009 WL 6498509, at *3. The Court notes, however, these decisions occurred prior to the Supreme Court's decision in *Law v. Siegel*, —— U.S. ——, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014), which clarified that bankruptcy courts are not to use Section 105 to provide remedies where such a remedy would be contrary to the express provisions and directives of the Bankruptcy Code. *Id.* at 1194. Since Section 362(k) makes clear that only injured individuals may pursue damages, allowing another entity to pursue damages for a stay violation effectively circumvents the limitation of Section 362(k).

This Court tends to agree with the decisions of the Northern District of Georgia that the Trustee lacks standing under Section 362(k) to seek damages. But even if the Court were to agree that the Trustee was an individual who could pursue a stay violation, the Court finds the estate is not the party injured by the Debtor's stay violation. The insurance check was made payable jointly to MP & B and Cranberry. While the Court has concluded the Debtor individually held an interest in the check, that interest was subject to Cranberry's security interest in the building and the insurance proceeds. The check was also made out to Cranberry. The party actually damaged by the Debtor's actions is Cranberry, not the estate. Particularly given that the Court has already denied the Debtor a discharge, the Court sees no basis for the estate to recover Cranberry's funds. Cranberry will be free to pursue recovery of these funds, upon the conclusion of the case, if it is not otherwise paid through the bankruptcy case. With respect to Count VII of the Trustee's Complaint, the Court therefore finds for the Debtor.

## CONCLUSION

The Court understands the Debtor's argument that insurance proceeds were used to make repairs and therefore his discharge should not be denied for the use of the funds. In effect, the Debtor argues, "no harm, no foul". However, laws are made to be followed and a lack of harm is not always the measurement. Here, with the Debtor's at least tacit consent, the name of Cranberry was forged on the back of the insurance check. The Court simply cannot and will not tolerate such actions occurring during the pendency of the bankruptcy case with the participation and consent of the Debtor. The Debtor will therefore be denied a discharge under 11 U.S.C. § 727(a)(2). The Debtor's actions may have violated the automatic stay, but the Court has concluded the estate was not damaged, given the facts here, and therefore, Count VII of the Trustee's Complaint is denied.

**IT IS ORDERED**